Filed 2/14/17 Certified for publication 3/15/17 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| RESIDENTS AGAINST SPECIFIC PLAN 380, | E063292 |
| Plaintiff and Appellant, <br> v. | (Super.Ct.No. RIC1312923) |
| COUNTY OF RIVERSIDE, | OPINION |
| Defendant and Respondent; | |
| HANNA MARITAL TRUST, | |
| Real Party in Interest and Respondent. | |

APPEAL from the Superior Court of Riverside County. Sharon J. Waters, Judge. Affirmed.

Johnson & Sedlack, Raymond W. Johnson, Abigail A. Smith, Kimberly A. Foy, and Kendall Holbrook; Johnson, Smith & Foy, for Plaintiff and Appellant.

Murphy & Evertz, Douglas J. Evertz, and Bradford B. Grabske; Gregory P. Priamos, County Counsel, Anita C. Willis, Karin Watts-Bazan, and Melissa R. Cushman, Deputy County Counsel, for Defendant and Respondent.

Allen Matkins Leck Gamble Mallory & Natsis, William R. Devine and Heather S. Riley for Real Party in Interest and Respondent.

Plaintiff Residents Against Specific Plan 380 (appellant) appeals from a judgment denying its petition for a writ of mandate challenging the decision of the County of Riverside (County) to approve development of a master-planned community put forward as Specific Plan 380 by real party in interest, Hanna Marital Trust.

The County commissioned an Environmental Impact Report (EIR) on the project, which determined all potentially significant environmental impacts except noise and air quality impacts would be reduced below the level of significance after mitigation. The final EIR responded to public comments on a draft EIR requesting further mitigation before the County approved the project. The Riverside County Board of Supervisors (Board of Supervisors) requested modifications of the plan before approving it and determined the changes did not require revision and recirculation of the EIR. After the revisions were codified, the Board of Supervisors certified the final EIR and approved the plan. The County then posted a public notice of its determination which included a description of the project containing errors about certain project details.

Appellant sought a writ of mandate in the trial court asserting the County failed to comply with procedural, informational, and substantive provisions of the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 2100 et seq.) The trial court denied the petition in its entirety and entered judgment in favor of the County and the Hanna Marital Trust.

2

On appeal, appellant contends we should reverse the judgment and direct the trial court to grant its petition on the grounds the County: (1) substantially modified the project after approving it; (2) approved the project without concurrently adopting findings, a statement of overriding consideration, and a mitigation plan; (3) failed to recirculate the final EIR after modifying the project; (4) certified the final EIR despite inadequately analyzing the impacts of the development of the mixed use planning area; (5) issued an erroneous and misleading notice of determination after approving the project; and (6) failed to adopt all feasible mitigation alternatives proposed in comments on the draft EIR. We affirm.

## I

## FACTUAL BACKGROUND

A. *Overview of the Keller Crossing Project*

The Keller Crossing Specific Plan Project (project) proposes a master-planned community with residential, mixed use, commercial, and open space components on approximately 200 acres of land in the French Valley region of Riverside County. The site is undeveloped; approximately 75 percent is used for agricultural purposes and the rest supports native and naturalized vegetation. State Route 79 borders the project to the east, Pourroy Road to the west, and foothills to the north. Keller Road runs through the southern portion of the site.

Single-family residences occupy the area to the south and west of the site. Single-family residences and agricultural land occupy the area to its east. The area to the north

3

is undeveloped, but approved for residential development and some mixed uses under a different specific plan.

The Hanna family has owned the site since 1979. In February 2008, the Hanna Marital Trust (Trust) began the approval process to allow development of "single-family homes, retail shops, a family entertainment center, a neighborhood commercial center, medical offices, a medical center, and office/flex space."

The project, as approved by the Board of Supervisors on November 5, 2013, includes a general plan amendment (GPA No. 951), a change of zone (CZ No. 7723), and a specific plan (Specific Plan 380). GPA No. 951 amended the Riverside County General Plan Land Use Element by changing the Riverside County General Plan Foundation Component designation from rural foundation to community development and the land use designation from rural residential to commercial retail, mixed use, very-low-density residential, low-density residential, medium-density residential, and open space conservation. CZ No. 7723 changed the zoning classification to those required to implement Specific Plan 380.

Specific Plan 380, as approved, divides the site into seven geographical sections (planning areas or PAs), which include three very-low-density residential units, 25 low-density residential units, 42 medium-density residential units, 39.5 acres of mixed uses, up to 650,000 square feet of commercial uses, 61.1 acres of dedicated open space, and 20.2 acres for roads and supporting infrastructure. Figure No. 1 shows the final approved disposition of uses.

Figure No. 1



B. *The Draft EIR and the Notice and Comment Period*

On July 28, 2011, the Riverside County Planning Department (Planning Department) announced the release of a draft EIR, describing the project and notifying interested parties where copies of the draft EIR and supporting documents would be available. The Planning Department set a public review period from August 8 to September 26, 2011, and indicated written comments received during the review period would be included in the final EIR.

5

The draft EIR evaluated a version of the plan which proposed breaking the site into eight planning areas, with areas dedicated to commercial offices, commercial retail establishments, and residential units. One planning area was dedicated to mixed uses, including both residential and commercial uses, and another set aside land for open space conservation. The draft EIR specified the acreage for each planning area and allocated uses among them as set out in Table No. 1.

| Table No. 1 | | | | |
|---|---|---|---|---|
| Area | Use | Acres | Units | Footage |
| PA 1 | Commercial Office | 9.9 | — | 50,000 |
| PA 2 | Commercial Retail | 8.8 | — | 125,000 |
| PA 3 | Commercial Office | 13.9 | — | 200,000 |
| PA 4 | Low Density Residential | 15.6 | 22 | — |
| PA 5 | Medium Density Residential | 20.8 | 73 | — |
| PA 6 | Mixed Use | 21.6 | 225 | — |
| PA 7 | Commercial Retail | 29.2 | — | 275,000 |
| PA 8 | Open Space Conservation | 61.1 | — | — |
| — | Roads | 20.2 | — | — |
| Totals | | 201.1 | 320 | 650,000 |

The draft EIR incorporated an analysis of the proposed project's potentially significant environmental impacts and proposed measures to mitigate them. The report concluded "[w]ith the exception for air quality and noise, all significant impacts would be

reduced to below a level of significance following implementation of the mitigation measures." With respect to air quality, the draft report concluded emissions from project construction would exceed regional criteria pollutant thresholds for certain kinds of emissions. The report identified measures to mitigate those effects, but concluded the air quality effects during construction and operation would be significant and unmitigable.

The Planning Department received 11 comment letters during the public review period. The letters came from public agencies, Native American tribes, and public utilities. The Planning Department responded to the comments and in some instances incorporated changes in the final report. Among those letters, were comments from the South Coast Air Quality Management District (SCAQMD) and the City of Temecula.

SCAQMD expressed concern about the project's air quality impacts and requested the Planning Department "require mitigation that reduces local resident's exposure to construction related emissions and reduces the project's operational emissions from new vehicular trips generated by the project." SCAQMD asked for revisions of Mitigation Measure AQ-3, which required contractors to use California Air Resources Board (CARB) Tier II-certified equipment or better for rubber-tired dozers, rubber-tired loaders, and scrapers. SCAQMD asked instead that, between January 1, 2012 and December 31, 2014, off-road diesel-powered construction equipment greater than 50 horsepower meet Tier 3 off-road emissions standards, construction equipment be outfitted with Best Available Control Technology devices, and emissions control devices achieve emissions reductions not less than what could be achieved by a Level 3 diesel emissions control

7

strategy for a similarly sized engine as defined by CARB regulations. After January 1, 2015, SCAQMD requested off-road diesel-powered construction equipment greater than 50 horsepower meet the Tier 4 emission standards, where available.

The City of Temecula also requested additional measures designed to further mitigate air quality impacts. Temecula pointed out Mitigation Measure AQ-12 specifies the "project will be required to exceed the 2008 Title 24 Energy Codes," but suggested it should "comply with current 2010 California Energy Code and should also consider, as reasonable mitigation measures, compliance with the 2010 California Green Building Standards to further reduce the impacts of the proposed project. Additionally, the proposed project should consider prescriptive mitigation measures such as attic fans, whole house fans, [and] photovoltaic, solar water heaters."

C. *The Final EIR*

The County released the final EIR in January 2012. The final EIR included the following map (figure No. 2) showing the allocation of land uses among the planning areas.

Figure No. 2



The final EIR evaluated a version of the plan in its basics identical with the plan evaluated in the draft EIR. The plan proposed breaking the same 201.1 acre project site into the same eight planning areas. Like the plan evaluated in the draft EIR, it dedicated 23.8 acres to commercial office uses in planning areas 1 and 3, 38 acres to commercial retail uses in planning areas 2 and 7, 15.6 acres to low-density residential uses in planning area 4, 20.8 acres to medium-density residential uses in planning area 5, 21.6 acres to mixed uses in planning area 6, 61.1 acres to open space conservation in planning area 8, and 20.2 acres to roads. Also as in the draft EIR, the low-density residential area would accommodate 22 residential units, the medium-density residential area would accommodate 73 residential units, and the mixed use area would accommodate 225 residential units, for a total of 320 residential units. The plan also provided for the same

9

400,000 square feet of commercial retail space and 250,000 square feet of commercial office space, for a total of 650,000 square feet dedicated to commercial uses.

The final EIR describes the kind of development allowed in each planning area. In planning areas 1 and 3, "[t]he Commercial Office designation would allow for a variety of administrative and professional office uses, including, but not limited to, business, law, medical, dental, chiropractic, architectural, engineering, and real estate offices. In addition, Commercial Office areas would be suitable for health and exercise centers or gyms; hotels and motels; restaurants; banks and financial institutions; day care centers; and churches, temples, and other places of religious worship. Other uses may be permitted at the discretion of the County Planning Director. [¶] . . . Planning Area 1 is anticipated to develop as a series of smaller office buildings, rather than a large office park. . . . [¶] . . . Planning area 3 would be appropriate for development of a contiguous office park; however, the planning area could be further divided into smaller parcels to accommodate a variety of smaller office complexes."

In planning areas 2 and 7, "[t]he Commercial Retail designation would allow for the development of commercial retail uses at a neighborhood, community or regional level, as well as for professional office and tourist-oriented commercial uses. [¶] . . . [planning area 2] is anticipated to be developed with a neighborhood shopping center that may include a grocery store, drug store, and other locally serving shops. . . . [¶] . . . [Planning area 7] is intended to accommodate development at a community or regional level, as well as professional office and tourist-oriented commercial uses. Other uses,

such as hotels, recreation and amusement facilities, and those outlined in the Commercial Tourist land use designation of the Riverside County General Plan, would be permitted."

In planning area 4, the low-density residential designation would allow "for the development of up to 22 dwelling units on 15.6 acres . . . Proposed residential units would be comprised of single-family, detached homes one-half-acre minimum lots. Intensive animal-keeping would be discouraged within the Low Density Residential land use designation; however, limited agriculture would be permitted. The Foothill Trail would traverse the northern portion of this planning area within the 100-foot-wide urban/wildland interface and fuel modification zone, between the proposed developed areas and Planning Area 8. Enclosure fences and signs would be installed along the interface where residential development abuts open space."

"Up to 73 single-family, detached residences on 5,000-sf minimum lots would be allowed in Planning Area 5 . . . Planning Area 5 would include an activity center near Planning Area 4. The activity center may consist of one or more of the following: community gardens, picnic tables, barbeques, a dog park, a play area or tot lot, and/or shade structures. In addition, the Foothill Trail would traverse the northern portion of this planning area within the 100-foot-wide urban/wildland interface and fuel modification zone, between the proposed residences and Planning Area 8."

Planning Area 6 "would be designated as Mixed Use. It may provide for the development of a CCRC [Continuing Care Retirement Community], which would allow seniors to 'age in place,' with flexible accommodations that are designed to meet their

11

health and housing needs as such needs change over time." The Final EIR specifies the CCRC may include 125 independent living units, 100 assisted living units, a skilled nursing facility with 100 beds, and a memory care facility with 50 beds. The final EIR notes "Planning Area 6 is not required to develop as a CCRC. Should this planning area not be developed with a CCRC, other commercial or residential land uses may be developed if they are compatible with the adjacent planning areas, and if no additional environmental impacts would occur (based on review by the County)."

Finally, the final EIR says in planning area 8 "61.1 acres (30.4 percent of the Specific Plan Area) would be designated as Open Space Conservation and would remain as permanent natural open space. Planning Area 8 would contribute open space land to Proposed Constrained Linkage 17 of the Western Riverside County [Multi-Species Habitat Conservation Plan]. The proposed project has received a Habitat Acquisition Negotiation Strategy (HANS) determination letter from the Regional Conservation Authority (RCA), concurring with the partial conservation proposed by the Specific Plan. Vegetation communities to be preserved within Planning Area 8 include riversidean sage scrub, non-native grassland, and agricultural land. No trails, hiking, or biking would be permitted within Planning Area 8."

Like the draft EIR, the final EIR concluded the plan's mitigation measures would reduce all environmental impacts below a level of significance, except for air quality and noise impacts. The final EIR concluded emissions from project construction "would exceed regional criteria pollutant thresholds . . . for emissions of volatile organic

compounds (VOCs), nitrogen oxides ($NO_x$), particulate matter that is 10 microns or smaller ($PM_{10}$), and particulate matter that is 2.5 microns or smaller ($PM_{2.5}$)." The report also concluded emissions during the operation of phases 1 and 2 of the project would exceed pollutant thresholds for VOCs, CO, and $NO_x$, and during the operation of phase 2 would also exceed the threshold for $PM_{10}$. The report also concluded emissions from short-term construction activities would exceed the localized pollutant thresholds for $PM_{10}$ and $PM_{2.5}$ at receptors located within 341 and 246 feet from construction activities. Though the plan set out several mitigation measures for each problem, the report concluded each would remain significant even after mitigation.

Regarding the noise impacts, the final EIR concluded "[i]mplementation of the project would result in temporary noise impacts related to construction equipment and activities." The plan includes several mitigation measures. However, the final EIR concluded the noise impacts would remain significant and unmitigable, even after taking those measures into account.

The final EIR incorporated the comments discussed in part I.B., *ante*, and included responses to each. First, SCAQMD recommended the Planning Department revise mitigation measure AQ-3 to require contractors to use construction equipment meeting Tier 3 and later Tier 4 off-road emission standards instead of Tier 2 standards. The County responded mitigation measure AQ-3 "reflects the construction equipment that is anticipated to be reasonably available at the time of project construction. As the applicant does not anticipate the reasonable availability of equipment meeting the more

13

stringent requirements proposed by SCAQMD, these have not been incorporated into the required mitigation measures."

Second, the City of Temecula recommended the project comply with then-current 2010 California Energy Code. The County agreed "the project will need to comply with the California Energy Code in effect at the time of construction," and responded "[t]his standard requirement does not conflict with Mitigation Measure AQ-12's requirement that the project exceed the 2008 California Title 24, Part 6 Energy Efficiency Standards by a minimum of 15 percent. As such standards are rapidly evolving, the 2008 code was chosen as the basis of comparison, rather than requiring conformance to a code that is likely to be out of date when the project is constructed."

Third, the City of Temecula recommended the plan require compliance with the 2010 California Green Building Standards and prescriptive mitigation measures, such as attic fans, whole house fans, and photovoltaic, solar water heaters. The Planning Department said "a performance standard was adopted, rather than prescriptive mitigation measures . . . [to] allow the applicant to tailor implementation to best fit the final project design and technology available at . . . construction."

D. *Modifications to Specific Plan 380 After the Final EIR*

1. *Planning Commission modifications*

On April 18, 2012, the Riverside County Planning Commission (Planning Commission) took up Specific Plan 380 and the final EIR.

14

At the hearing, Commissioner Petty proposed several changes. After hearing these proposals and other plan matters, the Planning Commission voted to continue the hearing on the project to allow revisions. The Trust revised the land use plan to address some of those issues, and on October 17, 2012, planning staff and the Trust presented the revisions.

The revised plan included changes to four planning areas. Planning area 1, which had been designated for development of 50,000 square feet of commercial office space, would be designated for very-low-density residential development—specifically six one-acre lots. Planning Area 3 would keep its designation for development of commercial office space, but all buildings in its southern portion abutting Keller Road would be limited to two stories in height. Planning Area 4 would keep its designation for low-density residential development, but lots at the western edge of the area, next to Pourroy Road, would be no more than half an acre in size, no smaller than 100 feet wide, and would not have access to Pourroy Road. Planning Area 6 would remain designated for mixed use development, but unrestricted high-density multi-family development would not be allowed. Retail uses would be restricted to small shops, such as a pharmacy, sandwich shop, or stationery store, to service the neighborhood. Instead of requiring a buffer of very-low-density residential development on the edge of planning area 5 next to the open space conservation zone, the revised plan proposed to include a 100-foot fuel modification zone.

Planning staff and the Trust presented a report by the County's environmental consulting firm analyzing whether the changes to the plan required recirculating the final EIR. The report says the modifications would not change the project's effects on agricultural, biological, cultural or paleontological resources, or geology and soils because they do not change the project footprint. It says reduction in the scale of development would reduce aesthetic impacts, greenhouse gas emissions, impacts related to the compatibility between the project and existing uses, as well as incrementally decrease impacts on air quality, utility use, and traffic. Finally, it says water quality impacts would be the same or slightly reduced and noise impacts would be consistent with those previously described in the final EIR.

The report concludes the modifications would not create new significant environmental impacts or substantially increase the severity of environmental impacts, and would reduce the severity of some environmental impacts. It also concludes there were no additional considerably different feasible project alternatives or mitigation measures that would lessen significant environmental impacts. As a result, it concluded the County was not required to recirculate the final EIR.

After the presentation, the Planning Commission voted to recommend approval of the plan with the modifications to the Board of Supervisors.

2. *Board of Supervisors modifications*

The Board of Supervisors took up the revised Specific Plan 380, GPA No. 951, and CZ No. 7723 on December 11, 2012.

The day before the meeting, more than a year after the comment period for the draft EIR, counsel for appellant submitted a letter containing comments on the final EIR and Specific Plan 380 with numerous recommendations and complaints about the project and the final EIR. Relevant to this appeal, it reiterates the air quality mitigation proposals in the comments submitted by the SCAQMD and the City of Temecula. Appellant also proposed to mitigate the noise impacts of project construction by installing temporary noise barriers, using only electric construction equipment where feasible, prohibiting construction vehicles from idling for longer than three minutes, resurfacing roads, banning trucks near vibration sensitive uses, and using rubberized asphalt.

At the hearing, after additional public comment, Supervisor Stone recommended further plan modifications. The Board of Supervisors voted to have planning staff implement those changes and return to present the revised plan a week later.

Planning staff and the Trust made revisions to the plan affecting five of its areas. Planning area 1 was redesigned to reduce the number of lots. Planning Area 3 was designated for medium-density residential development, allowing for the development of 42 to 70 single-family homes. Planning Area 4 would remain low-density residential, accommodate up to 19 single-family homes with lots of half an acre or larger, and lots at its western edge two acres or larger with no access to Pourroy Road. Planning areas 5 (medium-density residential) and 6 (mixed use) would be combined and the new planning area 5 would be designated for mixed use development. Reductions in allowable

development in planning areas 1, 3, and 4 could be transferred to the new planning area 5.

These modifications did not change the footprint of the project or alter the number of residential units or the allowable square footage for commercial development analyzed in the final EIR. The purpose and effect of the modifications was to move denser development away from existing low-density residential areas by moving it from the western and southern edges of the project into the center of the project.

A report by the County's environmental planning consultant again analyzed whether the changes to the plan required recirculating the final EIR. The report says the modifications would not change the project's effects on agricultural, cultural or paleontological resources, hazardous materials, or geology and soils because the modifications do not change the project footprint or scope of uses. It also says the modifications "would not result in a new significant impact or change in the severity of impact related to population projections, Housing Element Consistency, public services, and recreation" because the modifications would not change the number of allowable residential units or space allotted to commercial development. The report says relocating denser uses adjacent to existing residential areas to the center of the site would reduce the aesthetic and land uses compatibility impacts of the project.

The report indicates the modifications would not change greenhouse gas emissions, impacts on air quality, noise, or traffic, and would leave unchanged or slightly reduce impacts on hydrology and water quality. Finally, the report says "the potential use

18

in the northwestern portion of the development area would be modified from Medium Density Residential to Mixed Use," which "would be consistent with the use previously analyzed adjacent to the central portion of the linkage. Adjacency requirements identified in the Western Riverside Multiple Species Habitat Conservation Plan would continue to apply, minimizing potential indirect impacts. Thus, the proposed modifications would not change the EIR's conclusion that biological resource impacts would be significant but mitigable."

The report concludes the proposed modifications would cause no new significant environmental impacts, would not substantially increase the severity of existing impacts, and in some cases would reduce their severity. It also concludes there are no additional feasible project alternatives or mitigation measures that would clearly lessen significant environmental impacts. As a result, the report concludes, the County was not required to recirculate the final EIR.

After the presentation, the planning staff recommended approval of the project with those changes incorporated. The Board of Supervisors voted to accept the Planning Department's recommendation to tentatively certify the final EIR, approve Specific Plan 380, GPA No. 951, and the change of zone.

E. *The Specific Plan After Modification and Final Project Approval*

Between December 2012 and May 2013, the Trust and planning staff worked together to finalize the modifications to the plan. During that period, planning staff responded to inquiries about the status of the project from counsel for appellant, telling

19

them they were working with the Trust to redraft the final exhibits before the Board of Supervisors acted to amend the General Plan, certify the final EIR, adopt the Specific Plan, and amend the zoning ordinance.

In May 2013, the Trust submitted the final version of Specific Plan 380 to the County. The final plan incorporated the changes presented at the December 18, 2012 hearing. It combined former planning areas 5 and 6, located at the center of the project site, and increased the density of development allowed in the new, expanded planning area 5. It designated planning area 1 for very-low-density residential development (VLDR), permitting only three lots, and reinstated the 50,000 square feet of commercial office space originally designated for planning area 1 to the new planning area 5. The revised plan also changed the designation of planning area 3 from commercial office to medium-density residential development (MDR).

The changes to Specific Plan 380 had the primary effect of relocating denser uses to the center of the project site, creating a buffer of residential uses for existing residential areas to the south and west of the project. Table No. 2 compares the project as analyzed in the final EIR with the final plan as submitted to the Board of Supervisors for approval. The changes do not alter the footprint of the site. Nor do they change the number of residential units or the square footage of commercial development. Instead, they reduce development at the periphery of the site (green highlighted rows) by increasing development at the center of the site (orange highlighted rows).

20

| Table No. 2 | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Plan in Final EIR | | | | | Plan as Approved | | | | |
| Area | Use | Acres | Units | Footage | Area | Use | Acres | Units | Footage |
| PA 1 | Office | 9.9 | — | 50,000 | PA 1 | VLDR | 9.9 | 3 | N/A |
| PA 2 | Retail | 8.8 | — | 125,000 | PA 2 | Retail | 8.8 | — | 125,000 |
| PA 3 | Office | 13.9 | — | 200,000 | PA 3 | MDR | 13.9 | 42 | — |
| PA 4 | LDR | 15.6 | 22 | — | PA 4 | LDR | 18.3 | 25 | — |
| PA 5 | MDR | 20.8 | 73 | — | | | | | |
| PA 6 | Mixed | 21.6 | 225 | — | PA 5 | Mixed | 39.5 | 250 | 250,000 |
| PA 7 | Retail | 29.2 | — | 275,000 | PA 6 | Retail | 29.0 | — | 275,000 |
| PA 8 | Open Space | 61.1 | — | — | PA 7 | Open Space | 61.1 | — | — |
| — | Roads | 20.2 | — | — | — | Roads | 20.6 | — | — |
| Totals | | 201.1 | 320 | 650,000 | | | 201.1 | 320 | 650,000 |

On November 5, 2013, the final EIR, Specific Plan 380, GPA No. 951, and CZ No. 7723 came before the Board of Supervisors. The Board of Supervisors approved the plan as submitted by adopting (i) Resolution No. 2013-197 certifying the final EIR and adopting Specific Plan 380, (ii) Resolution No. 2013-224 amending the General Plan to adopt GPA 951, and (iii) Ordinance 348.4767 amending Ordinance No. 348 to accept CZ No. 7723 and zone the project site for development as provided in Specific Plan 380.

The EIR resolution included findings of fact, a mitigation monitoring and reporting plan, and a statement of overriding considerations.

F. *Notice of Determination*

The same day, the Planning Department filed a notice of determination (notice) with the county clerk in compliance with section 21152,[1] which requires an agency approving a project to file a notice of the approval within five working days. The notice informed the public the project will have a significant effect on the environment and that an environmental impact report was prepared. It also certified the final EIR was available to the general public at the Planning Department offices.

The notice also included a description of the project. However, the Planning Department used an out-of-date description. The notice says: "The project proposes up to 326 dwelling units, 650,000 square feet proposed for commercial use and 61.1 acres proposed for conserved open space within eight (8) planning areas. [¶] . . . The Specific Plan proposes 400,000 square feet of commercial retail uses, 200,000 square feet of commercial office uses, medium-density residential uses (up to 73 dwelling units), low-density residential uses (up to 22 dwelling units), mixed use (up to 225 housing units), open space conservation, and master plan roadways. There are 36.4 acres proposed for residential uses, 62.7 acres proposed for commercial uses, 21.6 acres proposed for mixed use, 61.1 acres proposed for open space and 19.3 acres for master plan roadways." The notice therefore inaccurately described the final project in several particulars.

_____

[1] Unlabeled statutory citations refer to the Public Resources Code.

22

G. *Trial Court Proceedings*

On November 18, 2013, appellant filed a petition for a writ of mandate in the trial court alleging the County failed to comply with the same procedural and substantive requirements of CEQA at issue in this appeal.[2]

The trial court held a hearing on the petition on February 13, 2015. On February 26, 2015, the trial court issued a written ruling denying the petition on all grounds asserted. On March 18, 2015, the trial court entered judgment in favor of the County and the Trust and against appellant. Appellant timely appealed.

## II

## DISCUSSION

CEQA and the regulations implementing it "embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency

---

[2] Appellant raised some issues in the trial court which it abandoned on appeal.

23

approved the project in the manner the agency chose if significant environmental effects are involved.'" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285-286.)

To achieve these goals, where the public agency determines a proposed development (not subject to an exemption) may have a significant effect on the environment, CEQA and its implementing regulations require a public agency to prepare an environmental impact report before approving the project. (*Id.* at p. 286.) The environmental impact report "is the 'heart of CEQA'" whose "purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.'" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 (*Laurel Heights*).)

A. *Standard of Review*

We review an agency's compliance with CEQA to determine whether there was a prejudicial abuse of discretion. (§ 21168.5; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*).) An agency abuses its discretion if it "'has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'" (*Vineyard*, at p. 426.) Our "review of the administrative record for legal error and substantial evidence . . . is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision." (*Id*. at p. 427.) "We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates

24

any legal error by the County and whether it contains substantial evidence to support the County's factual determinations." (*Ibid.*)

Our review of the County's factual findings for substantial evidence is highly deferential. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 984.) "The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 (*Save Our Peninsula*).) Substantial evidence is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, Cal. Code Regs., tit. 14, §§ 15088.5, subd. (a), 15384, subd. (a) (Guidelines); see also *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 ["A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable"].)

B. *The Timing of the County's Approval of Specific Plan 380*

1. *The County properly approved the project after the plan was modified*

Appellant contends the Board of Supervisors approved the project on December 18, 2012, when it voted to certify the final EIR and approve Specific Plan 380, GPA No. 951, and CZ 7723. Appellant contends this act was an abuse of discretion because the Trust and the County substantially modified Specific Plan 380 thereafter.

25

We disagree with appellant's characterization of the events for two reasons. First, the Board of Supervisors vote of December 18, 2012 gave only *tentative* approval of the EIR, Specific Plan 380 and associated documents. It gave its final approval on November 5, 2013, *after* planning staff and the Trust had codified the plan changes discussed at the December 18, 2012 hearing. Second, the Board of Supervisors requested and the staff incorporated the late plan modifications about which appellant complains *before* the tentative approval. The administrative record makes both these points clear.

At a hearing on December 11, 2012, the Board of Supervisors made specific requests for additional modifications to the plan and continued the matter for one week to allow planning staff to implement the changes. On December 18, 2012, planning staff presented the requested modifications. At the end of the presentation, planning staff said, "With these changes incorporated, Staff recommends certification of the EIR, approval of the SP, the General Plan Amendment and the change of zone." Supervisor Stone then moved to approve the project in accordance with the planning staff recommendation and the Board of Supervisors voted for the motion. Minutes of the hearing state the "matter is tentatively approved as recommended, and staff is directed to prepare the necessary documents for final action." Thus the December approval was tentative and final approval was explicitly conditioned on successful codification of the changes presented at the December 18, 2012 hearing.

Planning staff worked with the Trust in subsequent months to finalize Specific Plan 380. During that period, planning staff corresponded with counsel for appellant,

26

informing them they were redrafting the final exhibits before the Board of Supervisors acted to amend the General Plan, certify the final EIR, adopt Specific Plan 380, and amend the zoning ordinance. The Trust submitted the final version of Specific Plan 380 to the County in May 2013.

The final plan incorporated the changes staff presented at the December 18, 2012 hearing. The Board of Supervisors requested planning area 1 be designated very-low-density residential development, planning area 3 be changed from commercial office development to medium-density residential development, and planning areas 5 (medium-density residential) and 6 (mixed use) be combined and the new combined planning area designated for mixed use development. Reductions in allowable development in planning areas 1 and 3 were to be transferred to the new mixed use area. The final plan made those changes. Thus, planning staff simply incorporated the plan modifications presented to the Board of Supervisors before the tentative approval.

The record also shows the Board of Supervisors approved the plan as modified on November 5, 2013. It did so by adopting (i) Resolution No. 2013-197 certifying the final EIR and adopting Specific Plan 380, (ii) Resolution No. 2013-224 amending the General Plan to adopt GPA 951, and (iii) Ordinance 348.4767 amending Ordinance No. 348 to accept CZ No. 7723 and zone the project site for development as provided in Specific Plan 380. The EIR resolution included findings of fact, a mitigation monitoring and reporting plan, and a statement of overriding considerations. The Planning Department filed a notice with the county clerk in compliance with section 21152 on the same day. It

27

was those actions which "commit[ted] the agency to a definite course of action in regard to [the] project" and constituted project approval. (Guidelines, § 15352, subd. (a); *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 139.)

There is therefore no merit to the claim the County approved the project before making substantial changes to the plan. As a result, we conclude the County did not abuse its discretion.

2. *The County properly adopted findings, a statement of overriding considerations, and a mitigation plan concurrently with its approval*

Appellant also contends the County failed to comply with section 21081 of CEQA by approving the project without concurrently adopting findings of fact, a statement of overriding considerations (SOC), and a mitigation, monitoring, and reporting plan (MMRP). We disagree.

Appellant's position again rests on the contention the Board of Supervisors certified the EIR and approved the plan on December 18, 2012. Though the County did not, at that time, adopt findings of fact, an SOC, or MMRP, that fact is immaterial. As we discussed in part II.B.1., *ante*, the Board of Supervisors did not certify the EIR or approve the plan until November 5, 2013, at which time the County did adopt findings, an SOC, and MMRP. Because only the final action by the County approved the project, the County did not fail to comply with section 21081. Appellant's objection has no merit.

28

C. *The Notice of Determination*

Appellant contends the County filed an inadequate notice because it does not accurately describe the project as approved.

After a local agency decides to approve a project for which an EIR has been prepared, it must file a notice with the county clerk. (§ 21152, subd. (a); Guidelines, § 15094, subd. (d).) Among other things, the agency must ensure the notice contains: a brief description of the project, information identifying the project and its location, a statement that an EIR was prepared and certified under CEQA, the agency's conclusion whether the project will have a significant effect on the environment, whether it adopted mitigation measures and a mitigation monitoring program, and where the public may examine the final EIR and the record of project approval. (§ 21152; Guidelines, § 15094; *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 43, 52 (*Green Foothills*).) The agency must file the notice within five working days of project approval. (Guidelines, § 15094, subd. (a).)

The notice triggers the running of a statute of limitations on CEQA challenges. "To be timely, an action challenging the adequacy of an EIR must be commenced within 30 days after the county clerk posts the notice of determination that the project's lead agency has filed with it. [Citations.]" (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 532; see also § 21167, subd. (c); Guidelines, § 15094, subd. (g); *Green Foothills*, *supra*, 48 Cal.4th at pp. 48, 51.) "[T]he 30-day limitations period does not begin to run if the notice of determination is substantively defective in failing to properly

29

describe the lead agency's actions.  [Citations.]  A notice of a determination's adequacy is governed by the substantial compliance doctrine which '"means *actual* compliance in respect to the substance essential to every reasonable objective of the statute'" even though it may contain "'technical imperfections of form.'"'" (*Sierra Club v. City of Orange*, at p. 532.)

Here, the parties agree the notice sets out a description of the project which contains errors.  The notice erroneously describes the project as comprising 8 planning areas (instead of 7), 200,000 square feet of commercial office development (instead of 250,000), 73 medium-density residential units (instead of 42), 22 low-density residential units (instead of 25), 225 residential units in a mixed use area (instead of 250), 36.4 acres for residential uses (instead of 42.1), 62.7 acres for commercial uses (instead of 37.8), and 21.6 acres for mixed uses (instead of 39.5).  In effect, the notice incorporates elements of a description of the project as it existed after the Planning Commission changes of October 2012, but before the Board of Supervisors changes of December 2012.

We conclude these errors do not justify unwinding the County's approval of the project.  In the first place, the notice substantially complies with the informational requirements of CEQA.  It correctly identifies the project and its location.  It notifies the public an EIR was prepared and certified under CEQA.  It states the agency's conclusion the project will have a significant effect on the environment.  It says mitigation measures were made a condition of approval and that there is a mitigation monitoring program.  It

also provides the name and phone number of the County's contact person on the project and the address where the public may examine the final EIR and the record of project approval.

Moreover, though the brief description of the project contains errors, much of the description is correct. For example, though the notice erroneously says the project will have only 200,000 square feet of commercial office space along with 400,000 square feet of retail space, it correctly states it will allow for 650,000 square feet of commercial development overall. We conclude the notice's description of the project is close enough to the project as approved that it provided the public with the information it needed to weigh the environmental consequences of the County's determination, seek additional information if necessary, and intelligently decide whether to bring a legal challenge to the approval within the 30-day limitations period. (*Green Foothills*, *supra*, 48 Cal.4th at p. 43.)

Perhaps more importantly, appellant cannot show the errors in the notice were prejudicial. Appellant filed its CEQA challenge to the project approval on November 18, 2013—thirteen days after the County filed the notice and well before the statute of limitations had run. The remedy where a notice is insufficient to provide the public notice is to hold the 30-day statute of limitations does not apply. (*Latinos Unidos de Napa v. City of Napa* (2011) 196 Cal.App.4th 1154, 1167.) That remedy provides no relief to appellant. Moreover, appellant's CEQA challenge targets the plan as approved, not the plan as described in the notice. Thus, the erroneous description interfered with

31

appellant's ability to make an informed decision whether to pursue legal action no more than it interfered with its ability to bring a timely challenge. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.) We conclude the erroneous elements of the project description were not prejudicial error.

D. *Decision Not to Recirculate the EIR*

Appellant contends the County abused its discretion by failing to revise and recirculate the final EIR after making changes to the plan, claiming the decision not to recirculate was not based on substantial evidence. We disagree.

"Section 21092.1 provides that when a lead agency adds 'significant new information' to an EIR after completion of consultation with other agencies and the public [citations] but before certifying the EIR, the lead agency must pursue an additional round of consultation." (*Vineyard*, *supra*, 40 Cal.4th at p. 447.) New information is "significant" only if "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect." (*Laurel Heights*, *supra*, 6 Cal.4th at p. 1129; accord, Guidelines, § 15088.5, subd. (a).)

"Recirculation is not mandated under section 21092.1 when the new information merely clarifies or amplifies the previously circulated draft EIR, but is required when it reveals, for example, a new substantial impact or a substantially increased impact on the environment." (*Vineyard*, *supra*, 40 Cal.4th at p. 447.) A significant environmental impact includes both substantial and *potentially substantial* adverse changes in the

environment. (§ 21068; *Vineyard*, at p. 448.) We review an agency's determination whether a newly disclosed impact is significant and warrants recirculation for substantial evidence in the record. (*Laurel Heights*, *supra*, 6 Cal.4th at p. 1135.)

Here, appellant challenges the changes to Specific Plan 380 made after the Board of Supervisors heard comments on the plan on December 11, 2012. The differences between the plan described in the final EIR and Specific Plan 380 as approved have to do with the details of the allocation and arrangement of uses within the project site, not the kinds of uses permitted or the overall extent or density of the proposed development. The footprint of the project remains the same. The same 61.1 acres remain designated for open space conservation. As Table No. 2 (*ante*, part I.E. at p. 21) shows, the project as approved permits the same amount of retail development in the same planning areas, the same amount of commercial office development, and the same number of residential units as the version of the plan analyzed in the final EIR.

The primary change is the final plan swaps commercial office development in the southern portion of the site with residential development in the center portion of the site below the conservation area. The 250,000 square feet of commercial office space formerly permitted in planning areas 1 and 3 has been moved north into planning area 5 (formerly planning areas 5 & 6). Planning area 1 will no longer contain 50,000 square feet of commercial office development, but instead three residential units. Planning area 3 will no longer contain 200,000 square feet of commercial office development, but instead 42 residential units. Meanwhile, planning area 5 comprises 39.5 acres, is

33

designated for mixed uses, and may contain 250 residential units (225 of those in an assisted living facility) and 250,000 square feet of commercial office space. Previously the same area was split between medium-density residential development (20.8 acres) and mixed use development (21.6 acres), and permitted 298 residential units (225 of those in an assisted living facility).[3]

Appellant contends the final EIR "absolutely failed to address the impacts of changing the 20.8-acre former [planning area] 5 from medium-density residential to combine with the 21.6-acre former [planning area] 6 into one, 39.5-acre mixed use [planning area] 5 as approved by the County."[4] Appellant posits the change from medium-density residential to mixed use in planning area 5 "may cause a significant increase in trip generation and related effects above those evaluated and disclosed in the EIR," "[t]raffic would also likely increase and on-site traffic patterns would change with the redesigned Project," and "biological impacts may result from drainage, lighting, and noise from the Project's urban/wildlands interface."

---

[3] The final plan also reallocated approximately two and a half acres from the former planning areas 5 and 6 to planning area 4 and added three additional residential units. Appellant does not contend those and other development limitations to planning area 4 required the County to recirculate the EIR.

[4] To the extent appellant attacks the Board of Supervisors approval of the project based on the changes made at the December 18, 2012 hearing, rather than its determination that those changes did not require it to recirculate the EIR, it fires on the wrong target. We review the County's decision not to recirculate the EIR to determine whether substantial evidence supports that decision.

The County's expert consultants addressed these questions in evaluating whether the final EIR had to be revised and recirculated. Regarding the traffic effects of the revised plan, both the County's traffic and environmental experts concluded no change would occur to the amount of traffic. The basis for their conclusion was the project as analyzed in the final EIR and the revised project permit exactly the same number of residential units and exactly the same amount of commercial development. We conclude the County's determination was supported by enough relevant information and reasonable inferences—specifically that the number of trips is controlled by the number of residential units and the square footage of commercial development—that a fair argument can be made to support its conclusion. Appellant's additional contention the EIR should have been revised and recirculated to take into account changes in traffic *patterns* due to the redistribution of uses within the project site is not well taken. As the traffic and environmental experts explain, such circulation patterns are not analyzed at the EIR stage.

The County's environmental expert also concluded no new or substantially increased biological impacts would result from increasing the length of the interface between mixed use development and the conservation area. The expert acknowledged the "potential use in the northwestern portion of the development area would be modified from Medium Density Residential to Mixed Use," but concluded "this would be consistent with the use previously analyzed adjacent to the central portion of the linkage" and "[a]djacency requirements identified in the Western Riverside Multiple Species

35

Habitat Conservation Plan would continue to apply, minimizing potential indirect impacts." In other words, the County determined recirculation was not required because the final EIR already analyzed the effects of mixed use development adjacent to the conservation area and found the biological impacts significant but mitigable. Former planning area 6 was designated for mixed use development and the changes merely extended the adjacency further to the northwest. The County concluded mitigation measures that met the conservation plan for the shorter span would be adequate to do so over the longer span. We conclude the County's determination was based on enough information and reasonable inferences to withstand review.

Appellant also contends the change from commercial office development to very-low-density residential development in planning area 1 "may subject residences to noise from Keller Road and at SR-79 at Keller Road . . . [which] may therefore be greater than those disclosed in the EIR." According to appellant, "there is no evidence the mitigation required is adequate to mitigate [such] impacts." The County's environmental consultant reached the contrary conclusion, explaining "the EIR identifies anticipated noise levels adjacent to project roadways and requires (Mitigation Measures N-10 and N-12) additional analysis prior to the issuance of building permits to ensure that exterior and interior noise impacts at potentially affected residences would comply with the applicable ordinances. These existing mitigation measures would ensure that impacts would be reduced to below a level of significance." Again, this information provided the County

with an adequate factual basis for determining the changes did not result in a new or significantly increased impact requiring recirculation.

Finally, appellant contends the redistribution of land uses within the project may create "potential land use inconsistencies." However, appellant does not identify the potential inconsistencies. The County's environmental consultant concluded relocating denser uses from the areas adjacent to existing residential areas to areas in the center of the site would reduce the aesthetic and land uses compatibility impacts of the project. The residential development of planning areas 1 and 3 will buffer existing residential development to the south of the project from commercial development. Meanwhile, as the consultant noted, existing measures that address the interface of the conservation area and the former, smaller mixed use planning area will mitigate effects of an extended interface. Thus, the County had an adequate basis for determining the changes did not require recirculation.

*Save Our Peninsula*, *supra*, 87 Cal.App.4th 99 does not support finding recirculation was required here. In *Save Our Peninsula* the EIR called out that increased water pumping over a baseline figure would require reduced pumping in a nearby location as a critical mitigation issue. (*Id*. at p. 128.) Comments on the draft EIR specifically objected to using offset water credits at another location to mitigate increased pumping, and said it would be crucial to analyze the specifics of any offsite pumping offset to be sure there was a nexus between the offset and the pumping increase. (*Id*. at p. 129.) In response to the comments, the EIR agreed "the reduction must be 'an actual

37

reduction in documented current water use, not simply a reduction on potential future pumping.'" (*Ibid.*) However, the applicants did not identify an offset pumping location in the EIR until just before approval by the Board of Supervisors, and it did so without any discussion of the effects of the offsetting pumping reduction. (*Id.* at pp. 129-130.) The County accepted the proposed mitigation and approved the plan. (*Id.* at p. 130.) The appellate court found the decision was not supported and ordered the County to prepare a revised EIR to analyze "the feasibility of a pumping offset on the [proposed] parcel, including . . . whether there is an actual nexus between reduced pumping on that property and increased pumping on the [subject] property." (*Id.* at p. 143.) This case does not present a similar situation. The late changes to Specific Plan 380 did not involve an issue identified in the EIR and comments as requiring specific factual development. Moreover, here the County obtained and considered expert input on whether the changes made any significant change to the impacts.

*Vineyard*, *supra*, 40 Cal.4th 412 is also inapposite. In *Vineyard*, comments on a draft EIR identified the interruption of the migration of protected salmon species as a potentially significant impact. (*Id.* at p. 421.) The County responded the effect of further groundwater withdrawals was likely to be small and therefore insignificant. (*Id*. at p. 426.) However, the EIR recognized an exception "during periods of very low flow . . . [during which] these depletions could change the timing and areal extent of the dewatering of the stream invert, potentially impacting aquatic and riparian-dependent species and habitat." (*Ibid.*) The Court of Appeal concluded the exception "identif[ied] a

38

substantial, or at least potentially substantial, new impact" because "'periods of very low flow' are precisely those in which, according to comments on the draft EIR . . . migratory fish . . . are likely to be adversely affected by further dewatering." (*Id.* at p. 448.) Thus, the basis for finding no substantial environmental impact showed there was one, requiring further comment and analysis. Here, the Board of Supervisors requested changes to a plan to address comments about insulating existing rural residential areas from denser development. The changes were not designed to address, and substantial evidence shows they did not raise, significant environmental impacts.

E. *The EIR Adequately Analyzes Impacts of Uses in the Mixed Use Area*

Appellant contends the final EIR does not adequately analyze the air quality, noise, and traffic impacts of permissible development in the mixed use planning area. At bottom, appellant complains the final EIR analyzes the impacts of development of a CCRC but not the impact of higher-impact uses that may be allowed.

"'An EIR will be found legally inadequate—and subject to independent review for procedural error—where it omits information that is both required by CEQA and necessary to informed discussion.' But CEQA challenges concerning the amount or type of information contained in the EIR, the scope of the analysis, or the choice of methodology are factual determinations reviewed for substantial evidence. [Citations.] Put another way, '[w]e apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon

which the EIR relied because these types of challenges involve factual questions.'" (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1546.)

Here, appellant questions the scope of the analysis contained in the EIR and considered by the Board of Supervisors in approving the project. The EIR assumed the mixed use area, originally 21.5 acres, would be developed to include a CCRC with 125 independent living units, 100 assisted living units, a skilled nursing facility with 100 beds, and a memory care facility with 50 beds. The EIR analyzes the traffic, noise, and air quality impact of such a development, and the approval of the project is based on that analysis. However, the plan does not *require* the area be used for building a CCRC. If, in the end, developers choose not to build a CCRC, they may pursue other permitted commercial or residential land uses. Such uses, appellant points out, may generate substantially more traffic than a CCRC and, as a consequence, have greater air quality and noise impacts as well. Appellant contends the EIR was inadequate, and the Board of Supervisors approval based on it was erroneous, because its analysis did not evaluate the environmental impacts of those alternative developments.

We conclude the decision to limit the scope of the analysis was based on substantial evidence. As the EIR states, if the developer decides not to build a CCRC and seeks to pursue other permitted options, it could do so only if the proposed uses "are compatible with the adjacent planning areas, and if *no additional environmental impacts would occur* (based on review by the County)." The County could reasonably conclude

in view of those requirements that it was not necessary to undertake an environmental analysis of what are merely possible development schemes.

This is not an instance of an agency deciding to defer environmental analysis of likely effects of a project. (Cf. *Vineyard*, *supra*, 40 Cal.4th at p. 435 [EIR failed to include analysis of plans for providing water to a large, mixed use development].) The agency merely decided to limit the analysis to the proposed and likely development while imposing restrictions that would limit the scope of potential changes to the development plan. We conclude that determination was not error.

F. *The EIR Adequately Considered Specific Suggestions for Mitigating the Impact of the Project on Air Quality and Noise Levels*

Appellant contends the final EIR is inadequate because the County refused to adopt suggestions for mitigating significant air quality and noise impacts without providing adequate reasons to conclude the measures were infeasible.

"The Legislature has declared 'it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects. . . .' [Citation.] Our Supreme Court has described the alternatives and mitigation sections as 'the core' of an EIR." (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1028-1029.) "[A]n adequate EIR must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible. [Citations.]

41

While the response need not be exhaustive, it should evince good faith and a reasoned analysis." (*Id.* at p. 1029.)

### 1. *The County did not abuse its discretion by failing to adopt proposed mitigation measures for air quality impacts*

Appellant contends the County did not adopt all feasible mitigation measures for air quality impacts or respond to them adequately in the final EIR.

The final EIR concludes construction impacts are significant and unmitigable because, even after implementing mitigation measures, emissions will exceed SCAQMD's significance thresholds for volatile organic compounds, nitrous oxide, and particulate matter. The final EIR concludes the operational impacts of the project are significant and unmitigable because, even after implementing mitigation measures, long-term operational activity emissions will exceed the regional pollutant threshold for emissions of volatile organic compounds, nitrous oxide, carbon monoxide, and particulate matter.

In response to the draft EIR's determination the project will significantly affect air quality, commenters suggested several additional mitigation measures. In each case, appellant complains the County neither adopted the mitigation measure nor provided an adequate explanation why the proposed measure was not feasible. We consider each proposed measure and the County's response in turn.

First, SCAQMD recommended requiring additional mitigation to reduce local residents' exposure to construction-related emissions and to reduce operational emissions from new vehicular trips generated by the project. SCAQMD recommended revising

42

mitigation measure AQ-3, which provides, "[d]uring construction activity, the contractor will utilize CARB Tier II-certified equipment or better for the following pieces of equipment: rubber-tired dozers, rubber-tired loaders, and scrapers." SCAQMD proposed requiring "[a]ll offroad diesel-powered construction equipment greater than 50 hp shall meet Tier 3 offroad emissions standards" from January 1, 2012 to December 31, 2014 and Tier 4 thereafter.

The Planning Department responded, "Mitigation Measure AQ-3 reflects the construction equipment that is anticipated to be reasonably available at the time of project construction. As the applicant does not anticipate the reasonable availability of equipment meeting the more stringent requirements proposed by SCAQMD, these have not been incorporated into the required mitigation measures." In short, the Planning Department determined the proposed mitigation measure was not feasible because the applicant judged the proposed equipment meeting higher emissions standards would not be available at the time of construction.

Appellant contends the response was inadequate because it "cited no evidence or reasoning . . . the equipment meeting Tier III standards would not be available," and asks us to hold the determination was not supported by substantial evidence. This argument misstates the obligations of the agency in responding to proposed mitigation measures in an EIR. Responses "must be addressed in detail giving reasons why specific comments and suggestions were not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice."

43

(Guidelines, § 15088, subd. (c); see also *San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 596.) We conclude the County's stated reason for not adopting the proposed additional mitigation measure was sufficiently detailed to support the County's determination that the more stringent standard was not feasible, at least at the time the County approved the project.

Second, the City of Temecula suggested revising mitigation measure AQ-12. Temecula pointed out Mitigation Measure AQ-12 specifies the "project will be required to exceed the 2008 Title 24 Energy Codes," but suggested the project should "comply with current 2010 California Energy Code." The County responded "the project will need to comply with the California Energy Code in effect at the time of construction," and "[t]his standard requirement does not conflict with Mitigation Measure AQ-12's requirement that the project exceed the 2008 California Title 24, Part 6 Energy Efficiency Standards by a minimum of 15 percent." In short, the County determined adopting the proposed mitigation measure would not be useful because the measure already set an absolute standard and any legally mandated increase in the standard would control in any event. We conclude the County's reasoned response to this proposal provided adequate support for its decision not to adopt it.

Third, the City of Temecula suggested the plan require compliance with the 2010 California Green Building Standards and require prescriptive mitigation measures, such as attic fans, whole house fans, and photovoltaic, solar water heaters. The Planning Department responded "a performance standard was adopted, rather than prescriptive

44

mitigation measures.  This will allow the applicant to tailor implementation to best fit the final project design and technology available at the time of construction."  The County's preference for a performance standard, which will give the applicant and developer leeway and reduce enforcement and enforceability problems with the proposed very specific prescriptive measures, provided an adequate basis for refusing to adopt those measures.  (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 245 (*Clover Valley*).)

> 2. *The County did not abuse its discretion by failing to adopt late proposed mitigation measures for noise effects*

Appellant contends the County failed to adopt feasible mitigation measures for noise effects it proposed in its December 10, 2012 letter to the Board of Supervisors and failed to find its proposals infeasible based on substantial evidence.

Appellant proposed to mitigate the significant noise impacts of construction by installing temporary noise barriers, using electric construction equipment, prohibiting construction vehicles from idling for more than three minutes, resurfacing roads, banning trucks near vibration sensitive uses, and using rubberized asphalt.

A lead agency is required to respond to comments received during the notice and comment period.  However, "'there is no requirement that an agency respond in writing to comments submitted after expiration of the [EIR] comment period.'"  (*A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1808; see also Guidelines, § 15088, subd. (a) ["The Lead Agency shall respond to comments *received during the noticed comment period* and any extensions and *may respond to late*

45

*comments*"], italics added.)  For this project, the comment period ran from August 8 through September 26, 2011.  Appellant's comments were more than 14 months late. Thus, the County was not required to make a formal response.

In any event, we conclude the County did not abuse its discretion in deciding not to adopt the noise mitigation measures which require electric construction equipment that may not be available or duplicate existing requirements, like using noise attenuation fences and limiting idling.  (See *Clover Valley*, *supra*, 197 Cal.App.4th at p. 245.)

### III

### DISPOSITION

We affirm the judgment and award costs to Respondents.


SLOUGH _____
                                                                                          J.


We concur:


HOLLENHORST _____
                    Acting P. J.


McKINSTER _____
                    J.

Filed 3/15/17

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| RESIDENTS AGAINST SPECIFIC PLAN 380, <br>    Plaintiff and Appellant, <br>    v. <br> COUNTY OF RIVERSIDE, <br>    Defendant and Respondent; <br><br> HANNA MARITAL TRUST, <br>    Real Party in Interest and <br>    Respondent. | E063292 <br><br> (Super.Ct.No. RIC1312923) <br><br> ORDER CERTIFYING <br> OPINION FOR PUBLICATION |

THE COURT

    The requests for publication of the opinion filed on February 14, 2017 are GRANTED. The opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c). It is ORDERED that the opinion filed in this matter on February 14, 2017, be certified for publication.

SLOUGH              

J.

We concur:

HOLLENHORST      
                Acting P. J.

McKINSTER        
               J.