Filed 12/20/24  Russian Riverkeeper v. City of Ukiah CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| RUSSIAN RIVERKEEPER et al., <br>     Plaintiffs and Appellants, <br> v. <br> THE CITY OF UKIAH et al., <br>     Defendants and Respondents. | A168090, A169390 <br><br> (Mendocino County <br> Super. Ct. No. <br> SKUKCVPT202074612) |

The City of Ukiah (the City) operated a landfill from 1955 to 2001. After ceasing operations and considering for many years how to go about closing the landfill in a manner consistent with regulatory requirements, the City selected a cover system called ClosureTurf, certified an environmental impact report (EIR), and approved the proposed closure.  Appellants Russian Riverkeeper, Mateel Environmental Justice Foundation, and Vichy Springs Resort, Inc. challenge this approval, contending that the project description in the EIR failed to disclose that the cover system was only an interim measure and would eventually need to be replaced, that the EIR failed to analyze potential environmental impacts, that the draft EIR did not adequately analyze a range of reasonable alternatives, and that the City should have recirculated a revised draft EIR.  Appellants also challenge the trial court's award of costs to the City.  We affirm.

1

# FACTUAL AND PROCEDURAL BACKGROUND

The Ukiah Solid Waste Disposal Site (the landfill) occupies approximately 40 acres of a 283.5-acre parcel in Mendocino County. The City ceased operations at the landfill in 2001. The project at issue in this case is the closure of the landfill in a manner that accords with applicable regulatory standards. The EIR explained that the necessary components and systems include "the final cover and grading design" for the purposes of controlling stormwater and potential infiltration and ensuring slope stability, as well as systems for drainage and erosion control, landfill-gas control and monitoring, and groundwater and surface water monitoring.

In anticipation of closing the landfill, the City had extensive discussions with regulatory agencies, including the North Coast Regional Water Quality Control Board (Regional Board), the California Department of Resources Recycling and Recovery (CalRecycle), Mendocino County Public Health Department (the Local Enforcement Agency), and the Mendocino County Air Quality Management District, to develop a plan to close it in accordance with their requirements.

We need not recite in full the lengthy history of these discussions, but critical to them are the distinctions among different types of landfill covers. Title 27 of the California Code of Regulations (Title 27) has "prescriptive standards" for covers, which may be satisfied with a "natural" or compacted clay liner that meets certain requirements. (Cal. Code Regs., tit. 27, § 21090, subd. (a)(1)–(3).)[1] The prescriptive standards require a foundation layer of at least two feet made of materials such as compacted soil or incinerator ash,

---

[1] The State Water Resources Control Board has promulgated regulations to protect water quality in connection landfills. (Cal. Code Regs., tit. 27, § 20080 et seq.)

beneath a "low-hydraulic-conductivity layer" of at least one foot of compacted clay soil to protect water quality by minimizing generation of leachate and landfill gas, overlain by an erosion-resistant layer consisting of soil at least one foot thick covered with vegetation or of other erosion-resistant materials such as gravel and cobbles.[2] (*Ibid.*) The landfill must be maintained and monitored for at least 30 years, which is called the post-closure maintenance period (Cal. Code Regs., tit. 27, § 21180, subd. (a)), and the discharger must provide a maintenance plan with an annual cost estimate (Cal. Code Regs., tit. 27, § 21090, subds. (a)(3)(B), (a)(4)).

Where using a prescriptive cover is not feasible, either because it is unreasonably burdensome and costly or because it is impractical and will not promote the applicable performance standards, a cover with different (or "engineered") design may be approved. (Cal. Code Regs., tit. 27, §20080, subd. (b).) Such an "engineered alternative" must be consistent with the performance goals addressed by the prescriptive standard and must afford equivalent protection against water quality impairment. (*Id.*, subd. (b)(2).)

Two types of engineered alternatives are at issue here. The first is the design the City chose for the landfill, known as ClosureTurf. This closure design has several components. The first is a structured polyethylene geomembrane, to protect water quality. (See Cal. Code Regs., tit. 27, § 21090, subd. (a)(2).) Over it are placed a "specialized tufted geotextile," or "[e]ngineered [t]urf," and 5/8 of an inch of sand infill, to resist wind and erosion from weather conditions. (See Cal. Code Regs., tit. 27, § 21090,

---

[2] For these purposes, "leachate" is "any liquid formed by the drainage of liquids from waste or by the percolation or flow of liquid through waste." (Cal. Code Regs., tit. 27, § 20164.)

subd. (a)(3).) Underlying these three layers is a two-foot-thick soil foundation layer. (See Cal. Code Regs., tit. 27, § 21090, subd. (a)(1).)

Another engineered alternative—not chosen for the project—is a geosynthetic clay liner, consisting of a one-foot foundation layer, an artificial ("geosynthetic") liner, a polyethylene drainage net, and on top a two-foot-thick vegetative layer.

As originally contemplated, the landfill closure would be accomplished with a prescriptive compacted clay layer, and in 1999 the City approved a Final Closure and Post-Closure Maintenance Plan that proposed a compacted clay liner. But the Regional Board informed the City in 2000 that its clay liner design did not satisfy the prescriptive standards because the City proposed to compact only the top 12 inches of the foundation layer; as a result, the City's proposal would be considered an engineered alternative. After further review, in 2003 the City submitted for the Regional Board's approval a design using a geosynthetic clay liner, but ultimately it did not pursue this design.

In 2015 the City decided instead to proceed with ClosureTurf, based on its conclusion that this system provided greater slope stability and cost savings. The City's engineers considered it important that ClosureTurf provided more slope stability than other geosynthetic products because the landfill had steep slopes. ClosureTurf eliminated the potential for "soil creep and veneer failure" (i.e., mudslides) as a result of saturation of a vegetative soil cover, which is an advantage over the prescriptive cover and other geosynthetic cover systems. Also, the drainage system in ClosureTurf, which allowed rainfall to penetrate rapidly through the sand infill layer and into a drain liner, meant the cover was less subject to erosional damage, and stormwater runoff would be cleaner than would be the case with a vegetative

4

soil cover. In addition, ClosureTurf's rate of water infiltration into the landfill was substantially lower than that of the prescriptive cover. The City chose olive green as the color for the engineered turf.

By February 2020, the Regional Board agreed that the City's Final Closure and Post Closure Maintenance Plan adequately addressed Title 27's regulatory requirements.

As lead agency under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA; see *id.*, § 21067),[3] the City prepared a draft EIR, which it circulated in November 2019. Four comment letters were received during the comment period, and in the final EIR, released in April 2020, the City responded to those comments. Just days before the meeting at which the City had planned to certify the final EIR, it received comments from appellants, raising for the first time the concern that the use of ClosureTurf poses increased risks related to wildfire and water quality. The City delayed its public hearing while it considered these comments. In the interim, it arranged for Environmental Science Associates (ESA), an environmental consulting firm that was not involved in preparing the draft EIR, to address these new concerns. ESA prepared a memorandum analyzing the issues raised in the belated comments. Its conclusions were that the evidence did not support the newly raised concerns and there was no need to recirculate the EIR.

At a public hearing on August 5, 2020, the City certified the EIR and approved the landfill closure project.

Appellants brought their petition for writ of mandate on September 8, 2020. The trial court denied the petition and entered judgment in the City's

---

[3] All undesignated statutory references are to the Public Resources Code.

favor.  The City sought the costs it incurred in preparing the administrative record, and appellants moved to tax costs.  The trial court declined to tax costs and awarded the City $76,056.31.  Appellants moved for a new trial on the issue of costs, and the trial court denied the motion.

In case number A168090, appellants challenge the judgment.  In case number A169390, appellants challenge the post-judgment order awarding costs.  We have consolidated the two appeals for purposes of oral argument and decision.

<b>DISCUSSION</b>

## I.    STANDARD OF REVIEW

In reviewing an agency's compliance with CEQA, our inquiry is whether there was a prejudicial abuse of discretion.  (*Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1103; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard Area*); § 21168.5.)  Such abuse is shown if the agency did not proceed in the manner required by law or if its decision is not supported by substantial evidence.  (Pub. Resources Code, § 21168.5; see § 21168; Code Civ. Proc., § 1094.5, subd. (b).)  Our inquiry is not " ' "whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and whether the EIR is sufficient as an informational document." ' "  (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 653 (*San Joaquin Raptor*).)  It is the challenging party's burden to show that the decision to certify the EIR was incorrect.  (*Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 195 (*Mount Shasta*).)

On appeal, we review the City's actions, not the trial court's decision.  (*Vineyard Area Citizens*, *supra*, 40 Cal.4th at p. 427.)  Thus, we determine

6

independently "whether the administrative record demonstrates any legal error by the [City] and whether it contains substantial evidence to support the [City's] factual determinations." (*Ibid*.) On factual questions, we do not weigh conflicting evidence and do " 'not set aside approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.' " (*Id*. at p. 435.)

## II.   PROJECT DESCRIPTION

Appellants contend that the project description in the EIR is not accurate and complete because it does not describe the ClosureTurf as an interim remedy that will eventually need to be removed and replaced. And, they argue, the EIR should have discussed the environmental effects of replacing the cover.

An EIR must include a project description. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332.) "Under CEQA, a 'project' means '*the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment,' " and it "refers to the underlying 'activity' for which approval is being sought. [Citation.] The entirety of the project must be described, and not some smaller portion of it." (*San Joaquin Raptor*, *supra*, 149 Cal.App.4th at p. 654.) These requirements allow agencies and members the public to balance the benefits and environmental effects of the project, consider mitigation measures, and weigh other alternatives. (*Ibid*.) We review independently whether an EIR meets these standards. (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1224.)

7

The EIR describes the project as having the overall purpose of "clos[ing] the Ukiah Landfill in accordance with applicable regulatory standards," and it explains that one of the components required for closure is "the final cover." Appellants urge that this description is inaccurate because the cover will "inevitably" have to be removed and replaced, and the EIR failed to analyze the potential environmental effects of removal and replacement.

During the years the City was considering how best to close the landfill, it exchanged correspondence and documents with other agencies, including the Regional Board, about the proper construction of the cover. Appellants draw our attention particularly to a memorandum prepared in 2017 by a consultant to the Regional Board, Richard Thiel of Thiel Engineering, which discussed the design life of ClosureTurf. The memorandum characterized ClosureTurf as a variant of an exposed geomembrane cover (EGC), and explained that such cover systems can "be expected to degrade with time, and eventually fail over time because they are, after all, only thin plastic layers exposed to the environment." Although the sand and turf layer proposed for the project "could be expected to contribute to an extended service life compared to a standard EGC, it is inevitable that the Closure Turf system will degrade and need to be replaced as with any EGC concept."

Based in part on Thiel's opinions, the Regional Board provided comments on the City's proposed cover design. At the time, the City proposed a foundation layer of 12 inches, rather than 24 inches. The Regional Board explained that a thicker foundation layer would provide a greater physical barrier between the waste and the environment. And, the Regional Board stated, the geosynthetic cover "will inevitably degrade, stress crack, and expose the underlying cover soils" over the course of "decades (not centuries)," so "the ultimate closure condition that separates the degraded waste from the

8

open air environment will be the cover soils." The City proposed to use a geomembrane layer that was 50-mil thick, with a design life of approximately 40 years, rather than the apparently standard 60-mil thickness.[4] The Regional Board told the City that a 50-mil layer would be acceptable if the final cover was considered " 'long-term temporary' that will likely need to be replaced," if there was a financial mechanism to provide the funds to replace the ClosureTurf cover, and if a standard 24-inch foundation soil layer underlay the turf cover.

The manufacturer of ClosureTurf, Watershed Geo, responded with a letter disputing the characterization of the cover as " 'long-term temporary.' " It included a study showing the half-life of such turf fibers to be between 214 and 277 years, and stated that "[i]f the turf is properly maintained with sand infill, there is no need to replace the pro[t]ective turf cover for at least 100 years."

The City's engineering consultant, EBA Engineering, also responded to the Regional Board's comments. It disputed the Regional Board's statement that the geosynthetic cover would last decades rather than centuries, explaining that this timeframe was "not consistent with the ClosureTurf design features, research, and product testing." Contrary to what appear to have been the Regional Board's assumptions, the geomembrane component of the system was not exposed, but rather fully protected from ultraviolet degradation and other environmental stresses by the engineered turf and infill. "[E]xtensive testing" at third party laboratories "shows the protective turf cover with sand infill will last longer than 100 years," and when continually covered, the geomembrane was estimated to have a 450-year lifespan. These features, EBA Engineering opined, "refute the 'long-term

---

[4] A "mil" is a thousandth of an inch.

9

temporary' characterization . . . particularly in light of the projected life span that is greater than three times the postclosure maintenance period prescriptive standard of 30 years." Once the exposed turf blades degraded, the "grass" and geotextile backing could be replaced. Attached to the letter was a longevity analysis report prepared by Geosyntec Consultants in 2015.

In these circumstances, we conclude the EIR was not required to describe the cover as an interim remedy and analyze the environmental effects of replacing it. An EIR need not discuss "unspecified or uncertain" future developments, because such a discussion " 'would be based on speculation about future environmental impacts.' " (*Environmental Council of Sacramento v. County of Sacramento* (2020) 45 Cal.App.5th 1020, 1031.) There is substantial evidence that the cover design selected by the City—in which the geomembrane layer is not exposed to the environment—may last for 100 years or more, which renders the possible environmental consequences of replacing the synthetic cover generations in the future "unspecified or uncertain." (*Ibid*.; see *Citizens' Committee to Complete the Refuge v. City of Newark* (2021) 74 Cal.App.5th 460, 479 [potential responses to changed environmental conditions in 50 to 80 years not part of project].) This time frame is well in excess of the 30-year post-closure maintenance period required by Title 27. (See Cal. Code Regs., tit. 27, § 21180, subd. (a).) An agency need not " 'dimly guess' about potential impacts based on uncertain and nonspecific information and many unknowns." (*Santa Rita Union School Dist. v. City of Salinas* (2023) 94 Cal.App.5th 298, 349.) Here— where the record supports the conclusion that the cover is likely to function properly for at least a century—the City was not required to characterize the proposed project as an interim remedy or analyze the environmental effects that may occur when the cover, or portions of it, need to be replaced.

10

Appellants point out that the postclosure maintenance plan for the project provides an estimate of maintenance costs during the 30-year maintenance period that includes sums for geomembrane replacement, demonstrating that replacement was reasonably foreseeable. The response to the Regional Board's comments in the final EIR explains that the City provided financial assurances to address a possible replacement during earlier discussions with the Regional Board about the proper thickness of the foundation layer and the geomembrane liner, but that nonetheless testing showed the protective turf cover with sand ballast would last more than 100 years. The response also explained that the City had addressed replacement costs in the postclosure maintenance plan due to concerns about the possibility of catastrophic wildfires. But none of this shows that the proposed cover is an interim remedy likely to need replacing within a few decades, that the EIR should have addressed the effects of the cover's uncertain and unknown future replacement, or that the EIR has failed in its mission as an informational document.

## III. EIR'S ANALYSIS OF ENVIRONMENTAL EFFECTS

Appellants contend the EIR lacked an adequate analysis of environmental impacts in three respects.

An EIR must discuss in detail all of a project's significant effects on the environment. (§ 21100, subd. (b)(1).) When preparing an EIR the lead agency must " "consider and resolve *every fair argument* that can be made about the possible significant environmental effects of a project.' " (*Visalia Retail, LP v. City of Visalia* (2018) 20 Cal.App.5th 1, 13 (*Visalia Retail*).) A " 'fair' argument" for these purposes must be based on substantial evidence, including " 'fact, a reasonable assumption predicated on fact, or expert opinion supported by fact.' " (*Id*. at pp. 13–14, quoting § 21080, subd. (e)(1).)

11

If an agency determines that an effect will not be significant, the EIR need not discuss it in detail, but may instead include " 'a statement briefly indicating the reasons for determining that various effects on the environment of a project are not significant and consequently have not been discussed in detail in the environmental impact report.' " (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109, citing § 21100, subd. (c).)

In our review, we bear in mind that an EIR is an informational document, and the ultimate inquiry we make is "whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 (*Sierra Club*).) We give deference to factual determinations, including the choice of methodologies to analyze an environmental effect, but we review de novo whether the EIR satisfies the statutory criteria and serves its purpose as an informational document. (*Ibid*.) Where the challenge is to the EIR's underlying factual conclusions, we review for substantial evidence, not setting aside the EIR on the ground that another conclusion would have been equally or more reasonable. (*Id*. at p. 512.) It is a project challenger's burden to point to *substantial* evidence supporting a fair argument that a project may have a significant impact. (*Visalia Retail*, *supra*, 20 Cal.App.5th at p. 17.)

## A.    Wildfire Risk

### 1.    Additional Background

Appellants contend the EIR was inadequate because it failed to evaluate the project's contribution to a range of wildfire risks.

12

The initial study for the project considered whether the project would expose people or structures to significant risk of loss, injury, or death involving wildland fires, and concluded it would not. Specifically, the initial study noted that after the project was completed there would be no long-term occupancy by workers or others who might contribute to the potential for wildland fires, although it was possible that fires could be started by construction vehicles.

The draft EIR stated that the City had identified the appropriate scope of the EIR by preparing an initial study and obtaining input from appropriate agencies and the public. The City concluded that in certain areas it had found no significant impacts or impacts that would require mitigation, and thus eliminated those areas from consideration. Among the areas not analyzed in the EIR were risks associated with hazards and hazardous materials. According to the draft EIR, the project would comply with all regulatory requirements to eliminate or minimize potential hazards associated with the landfill, including risks related to fire, and no significant long-term impacts were anticipated once the final cover was completed.

In its comments on the draft EIR, the Regional Board said that, in light of California's recent experiences with catastrophic wildland fires, the project's synthetic turf design was "an inherent surface-based vulnerability in this regard." For that reason, as well as because of the possibility that the synthetic turf might degrade, the Regional Board requested a financial assurance mechanism to address a possible replacement if the liner failed. In response to this comment, the final EIR noted that the City shared concerns about the potential of a catastrophic wildfire to affect the landfill cover, and explained it had a post-closure maintenance plan and would take out adequate insurance to cover the cost of replacement if necessary.

13

After the final EIR was released, appellants submitted comments arguing that the synthetic cover was particularly flammable and, unlike a natural cover, might release dangerous toxic materials if it caught fire. They attached a report by PANGEA Environmental Services, Inc. (Pangea), opining that the synthetic cover might decompose under fire conditions, giving off hazardous products; that it appeared the cover would contain fibers made of polyethylene, a combustible substance; and that airborne emissions from the cover during a fire would represent a significant health risk to nearby residents and firefighters. Pangea based its opinion in part on its understanding that PFAS chemicals—short for perfluoroalkyl and polyfluoroalkyl substances—have been found in artificial turf and that exposure to PFAS chemicals can be detrimental to human and animal health.

The City arranged for the environmental consulting firm ESA to carry out further analysis in response to these concerns. In a memorandum of July 17, 2020, ESA explained that tests had been conducted on ClosureTurf by placing a fire source directly on them, using standards prescribed by the American Society for Testing and Materials (ASTM) for roof coverings. In the tests, the turf blades under the direct fire were either burned away or melted, and blades four to six inches from the fire sources also melted. The adjacent turf did not ignite or spread fire away from the flame sources, and the fire did not burn through the underlying structured membrane. ESA's memorandum attached a report by Richgels Environmental Services, which conducted the tests, explaining in detail the methods used and the results. ESA concluded, "there is no basis to [appellants'] allegations that the landfill cover would constitute a fire hazard or spread fire to adjoining areas if it were to be exposed to sources of ignition." On the other hand, ESA explained, "[n]atural grass cover . . . is easily ignited and carries fire readily. In this respect, the

14

proposed landfill cover would result in an improved condition when compared with the existing natural vegetation that currently covers the landfill, or the Compacted Clay/Natural Cover Alternative advocated by [appellants]."

ESA expressly disagreed with Pangea's assessment of the combustibility of the synthetic cover. It explained that Pangea had studied the wrong materials, that is, Pangea had provided material safety data sheets (MSDS's) for an unrelated artificial turf product and for high-density polyethylene in its raw form, "which are not actually representative of the ClosureTurf product." Both the tests conducted on ClosureTurf and the MSDS's for that product—which stated the material is not flammable or combustible and not expected to pose a fire hazard—countered appellants' claim that the product was extremely flammable. And, ESA concluded, there was only an insubstantial likelihood the landfill cover would burn in quantities sufficient to cause widespread emissions of airborne toxins. ESA also stated, and provided evidence, that the proposed landfill cover does not contain PFAS chemicals.

In addition, the Fire Chief of the Ukiah Valley Fire Authority opined, based on his many years of experience with firefighting, that the proposed artificial covering would burn more slowly and with much less intensity than vegetative fuels, and that although toxic air contaminants could be released, the extent would be "very limited" given the relatively low fire intensity.

### 2. *Analysis*

We reject appellants' challenge to the EIR's discussion of wildfire risks. The EIR explained that the project would comply with all regulatory requirements to eliminate or minimize potential fire hazards and that no significant long-term impacts were anticipated. The final EIR responded to the Regional Board's comment that the project's synthetic turf design was

15

vulnerable to damage by acknowledging the concern that a wildfire could harm the cover and agreeing to financial measures to cover the cost of replacement if necessary. No concerns about the cover releasing harmful toxins were raised during the comment period. Only after the final EIR was released did appellants raise that issue for the first time.

The City was not required to respond in writing to this late comment. (See *Residents Against Specific Plan 380 v. County of Riverside* (2017) 9 Cal.App.5th 941, 972 (*Residents Against Specific Plan 380*); CEQA Guidelines, § 15088, subd. (a).)[5] Nevertheless, after receiving the late comments, the City had ESA conduct a detailed analysis, which explained why Pangea's report was flawed and set forth in detail the reasons that proposed cover system did not pose any significant fire hazard. In the circumstances, Pangea's report does not constitute substantial evidence of a significant environmental impact that required further discussion in the EIR.

Appellants criticize ESA's analysis, arguing it does not address flammability in "real world conditions" such as a parched landscape on a hot afternoon or with the possible presence of methane gas at the landfill. It appears that the concern about methane was raised for the first time the day before the City held its hearing on the proposed project, and it was unsupported by any analysis. And ESA's analysis shows the proposed cover was tested when "nearly 'bone dry.' " Appellants have not shown the City's conclusions were unsupported by substantial evidence.

We thus conclude that the EIR was not required to include a further discussion of fire hazards, and that substantial evidence supports the City's

---

[5] The CEQA Guidelines are found in title 14, section 15000 et seq. of the California Code of Regulations. We accord them great weight unless they are clearly unauthorized or erroneous. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2.)

16

finding that the project would not cause significant impacts related to hazards and hazardous materials.

### B.     Water Quality

Appellants contend the EIR's discussion of the project's effects on water quality was inadequate because it did not address the possible effects on water quality from runoff of microplastics originating in the landfill's synthetic cover.

#### 1.     *Additional Background*

The EIR's discussion of water quality explained the hydrology of the project area, set forth the applicable water quality standards found in federal and state law, and examined whether the project would have a significant impact by violating water quality standards or waste discharge requirements or otherwise substantially degrading surface or groundwater quality.  It explained that disturbed soils associated with construction activities could be a source of water pollution and set forth the measures that would be taken to ensure any effects would be less than significant.  After completion of construction, consistent with the requirements of the Regional Board's waste discharge requirements, there would be a program to monitor leachate, groundwater, and surface water to ensure the landfill complies with all water quality standards.  The EIR concluded that compliance with regulatory requirements, including corrective actions if necessary, would prevent discharge of pollutants to surface waters or groundwater and that the resulting environmental impact would be less than significant.

In comments after the final EIR was released, appellants for the first time argued that the artificial turf cover could be a source of water pollution from microplastics and PFAS that must be analyzed.  In support, appellants pointed to Pangea's opinion that PFAS chemicals were present in artificial

17

turf and could be released from turf through exposure to abrasion, such as maintenance equipment or feral pigs rooting, and could find their way into nearby water supplies. Appellants also relied on a master's thesis from Stockholm University, *Tracking Microplastics from Artificial Football Fields to Stormwater Systems* (Ran Li, Department of Physical Geography, Stockholm University (2019)), which concluded that runoff from rainfall carried microplastics to stormwater as the artificial turf degraded and broke down over the course of the turf's 8- to 15-year life span.

ESA prepared an analysis responding to these contentions. It explained that testing on the material proposed to be used for the turf fiber indicated it would retain 75 percent of its original tensile strength—its resistance to breaking under tension—after 30 years and more than 60 percent after 100 years, when exposed to ultraviolet radiation. This meant the product would degrade slowly, releasing only a "negligible" amount of microplastics. And, because a layer of sand would be placed onto and worked into the engineered turf, exposure to radiation would be reduced, further reducing degradation of the blades, or tufts of artificial turf. ESA also pointed out that the product discussed in the Stockholm University thesis paper was "very different" from ClosureTurf and apparently of lower quality, since it was expected to last only eight to 15 years, and unlike the proposed landfill cover, it used as a filler material rubber granulates that were the greatest contributing element of the microplastics run-off. The thesis paper also studied active sports fields, which were subject to abrasion during sports activities and snow removal, activities that would not take place on the

18

landfill cover.  Finally, ESA pointed out, ClosureTurf did not contain PFAS chemicals.

### 2. *Analysis*

Based on this and other evidence in the record that the exposed blades of the landfill cover would eventually degrade when exposed to ultraviolet light, appellants argue the EIR was inadequate because it did not address how the activities of animals on the cover might affect the rate of breakage, or what the consequences would be if microplastics entered the Russian River, a source of drinking water in the area.

We are unpersuaded.  We recognize that an EIR must set forth all substantial or potentially substantial environmental impacts of a project, resolving every fair argument that can be made about possible significant effects (*Visalia Retail*, *supra*, 20 Cal.App.5th at p. 13), and that a post-EIR discussion cannot make up for an inadequate analysis in the EIR itself (*League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 107).  Here, the EIR analyzed the project's potential water quality impacts and concluded they would not be significant.  The concern about microplastic pollution of waterways was raised, not only after the end of the public comment period for the draft EIR, but after the final EIR was released, and as we have explained, the City was not required to respond to late comments. (*Residents Against Specific Plan 380*, *supra*, 9 Cal.App.5th at p. 972; CEQA Guidelines, § 15088, subd. (a).)  Nevertheless, the report prepared by ESA before the project was approved explained why the information appellants belatedly submitted did not indicate a potentially significant impact on water quality:  the Swedish paper examined a different and inferior product that used rubber rather than sand as filler, and ClosureTurf does not contain

19

PFAS chemicals. In the circumstances, we cannot fault the City's finding that the EIR's discussion of water quality was adequate.

## C. Visual Impacts

Appellants' final challenge to the adequacy of the EIR's analysis of environmental impacts is that it disregarded the "visual eyesore" that will be caused by a permanently green plastic cover.

### 1. Additional Background

The draft EIR stated that the project site was at the end of Vichy Springs Road, which the Mendocino County General Plan did not identify as a scenic resource; that it would not be visible from the nearby Vichy Springs Resort or any other sensitive receptor; and that the cover would be designed to blend into the existing landscape. As a result, according to the draft EIR, the project would not affect existing views from scenic corridors or roads. Of three possible colors for the artificial cover—olive green, tan, and a blend of olive green and tan—olive green was chosen as the preferred color because it "provides arguably the best color option to blend into the natural and surrounding environment." The draft EIR included pictures of views from "[k]ey [o]bservation [p]oints," including from Vichy Springs Resort, showing the landfill was not visible, as well as pictures of other landfills with artificial covers.

In comments submitted during the public review period on the draft EIR, Vichy Springs Resort expressed concern about the project's visual impacts. It argued that the olive green color chosen to cover the 40-acre landfill site would be "bright and very ugly" and that it would be in stark contrast to the surrounding hills, which were brown during the dry season. It also provided evidence that the project site was visible from local residences and hiking trails on the resort's property.

20

The final EIR's responses to comments explained the City's continued position that the artificial cover would not have an adverse visual impact. Although the turf cover would not change color during the dry season along with the surrounding natural grasses, contrasting landscape colors are common in northern California, due to irrigation or natural sources of water such as rivers or lakes, and any starkness in the green color would be softened by the sand ballast. The turf is designed to look like natural grass, so it would not appear artificial from a distance of 500 feet or more. And the closest building at Vichy Springs Resort is about 1,200 feet from the landfill site, its view obscured by trees, elevation and distance; the hiking trails are farther away; and any partial views would not be unharmonious.

Consistent with these responses, the final EIR revised and expanded the discussion of visual impacts. Among other things, it explained that although the landfill cover would not be visible from the main lodges and primary facilities of the Vichy Springs Resort, there are partial distant views of the landfill site from some vantage points on the 700-acre resort, including from its hiking trails; that from that distance the artificial turf would be indistinguishable from natural grass; and that color contrasts on the landscape are common. To support its conclusions, the final EIR included pictures of viewpoints of the landfill site, a simulation of the landfill after construction, artificial turf and natural grass of various colors, including olive green, and examples of green grass and vegetation next to brown dry hills in various parts of California.

### 2. *Analysis*

Appellants argue that the draft EIR's assertion that the project would not be visible from the Vichy Springs Resort or any other sensitive receptor was inaccurate, and that it provided a misleading description of how visible

21

the landfill cover would be. And, they contend, the final EIR's revised analysis "downplayed and disregarded" the landfill cover's visual impacts.

In considering this challenge, "[t]he question before us is not whether substantial evidence supports a petitioner's critique of the EIR; it is whether substantial evidence supports the agency's conclusions." (*East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1242, citing *Sierra Club v. County of Fresno, supra*, 6 Cal.5th at p. 512.) Such evidence exists here, and it was set forth in detail in the EIR. In the final EIR, the City considered the objections and evidence submitted by Vichy Springs Resort and explained why, even taking them into account, the project's aesthetic effects would not be significant, supporting its discussion with images. This discussion was ample to allow both the City and members of the public to understand and consider the aesthetic issues raised by the landfill cover.[6] (See *Sierra Club*, at pp. 515–516.)

## IV. RANGE OF ALTERNATIVES STUDIED IN EIR

### A. Additional Background

The draft EIR analyzed in detail only one alternative to the project—the no-project alternative—and concluded it would not meet any of the project objectives. With this alternative, the landfill would not be properly closed, and it would be susceptible to slope instability and detrimental impacts to water and air quality.

---

[6] Appellants quibble that an illustration in the draft EIR showing how a human figure appears smaller and less prominent as a viewer moves progressively farther away is misleading because the 40-acre landfill is far larger than a human being. Whether or not the illustration is helpful, the other portions of the EIR we have discussed provide substantial evidence to support the City's conclusions.

The draft EIR also summarized three alternatives that the City had considered and eliminated from further consideration. The first, which it titled "Compacted Clay and/or Geo Synthetic Clay Liners with Natural Vegetation Closure Alternative" (the clay cover alternative) referred collectively to two liner types we have already described, the prescriptive compacted clay liner and an engineered geosynthetic clay liner. (Boldface omitted.) The draft EIR explained that the compacted clay liner was a 1974 standard that in 1985 was adopted as part of Title 27. But, the EIR went on, the last 35 years had shown that there are serious disadvantages to clay layers, particularly on sites with slope stability issues. The project site, with a steep slope of more than 2:1, carried with it an unreasonably high potential for failure of a clay alternative. The draft EIR also described other environmental disadvantages to the clay cover alternative: construction would cause greater noise, air quality, and traffic impacts because of the need to import or excavate large volumes of clay and natural vegetation, and there would be greater maintenance costs to prevent fires and keep rodents from compromising the clay layer structure.

A second alternative eliminated from further consideration was relocation of the landfill, an alternative found technically infeasible, cost-prohibitive, and likely to cause significant and unavoidable traffic and noise impacts.

The third alternative not carried forward was an alternative color for the landfill's turf cover. The draft EIR explained the olive green had been selected because it would best blend into the surrounding environment; that the landfill was not accessible to the general public and would not be visible at any public access point or on the nearby Vichy Springs Resort property;

23

and that a different color for the cover would not avoid any significant aesthetic impacts.

In comments on the draft EIR, Vichy Springs Resort argued the City had failed to consider an adequate range of alternatives and, in particular, that it should have considered an alternative calling for a natural cover rather than an artificial cover in order to reduce the project's aesthetic impacts. The comment letter included photographs showing that the landfill site was visible from various observation points, including trails on the resort's property and nearby residences.

The Regional Board also submitted comments on the draft EIR. It expressed concerns about the alternatives analysis, pointing out that the sole alternative studied, the no project alternative, was not viable from a regulatory point of view. It also suggested the EIR could be improved by including an economic cost analysis to support the narrative discussions of the eliminated clay cover alternative.

In response to these comments, the final EIR included an expanded evaluation of the clay cover alternative, treating it as an alternative to be analyzed rather than one considered and eliminated. The long-term aesthetic and visual impacts of the clay cover alternative, it concluded, would be similar to those of the proposed project. Although the color of the ClosureTurf cover would not change with the seasons, the final EIR explained, it is common in northern California to see irrigated green grass next to dry hills, and from the distance at which any onlooker would see the project, the ClosureTurf cover would be virtually indistinguishable from a clay cover with natural vegetation.

As to other environmental impacts, the final EIR concluded the clay cover alternative would produce slightly greater air quality, greenhouse gas,

and noise impacts than the proposed project, both during and after construction; and that it would involve increased disruption to biological resources during construction and an increased water quality impacts from erosion due to the steep slopes of the landfill. The final EIR concluded the proposed project was the environmentally superior alternative. It included a chart comparing the potential environmental impacts of the project, the clay cover alternative, and the no project alternative, and concluded that with mitigation, the project would have no significant environmental effects and that the effects of the clay cover alternative would be either equal or potentially greater.

## B. Analysis

CEQA requires an EIR to consider and analyze alternatives to a project that would reduce adverse environmental effects. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163 (*Bay-Delta*); Pub. Resources Code, § 21061.) The CEQA Guidelines provide that an EIR shall "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (CEQA Guidelines, § 15126.6, subd. (a).) The EIR must also identify alternatives that were considered but eliminated from detailed consideration, for either failure to meet most of the basic project objectives, infeasibility, or inability to avoid significant environmental impacts. (CEQA Guidelines, § 15126.6, subd. (c).) It must also discuss and analyze a " 'no project' " alternative. (CEQA Guidelines, § 15126.6, subd. (e)(1).)

" 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason,' " a rule that

requires the EIR to " 'set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' " (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1163.)  It is the appellant's burden to demonstrate that the range of alternatives chosen was inadequate.  (*Mount Shasta*, *supra*, 210 Cal.App.4th at p. 199.)

Although EIR's commonly examine alternatives in addition to the no-project alternative, there may be circumstances in which no other alternative need be examined.  For instance, in *Save Our Access etc. v. Watershed Conservation Authority* (2021) 68 Cal.App.5th 8 (*Save Our Access*), the court considered the adequacy of an EIR for an improvement project in a national forest.  (*Id*. at p. 14.)  The EIR explained why it eliminated several alternatives and examined no alternative to the project other than the no-project alternative.  (*Id*. at pp. 30–31.)  On appeal, a challenger argued this analysis was inadequate, pointing to several alternatives he had proposed in comments on the draft EIR.  (*Id*. at p. 32.)  The appellate court rejected this argument.  It explained, first, that there is no categorical rule that an EIR analyze multiple project alternatives (*id*. at p. 31) and that courts generally defer to an agency's selection of alternatives unless the petitioners " '(1) demonstrate that the chosen alternatives are " ' "manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives" ' " and (2) submit evidence showing the rejected alternative was both "feasible" and "adequate," because it was capable of attaining most of the basic objectives of the project' " (*id*. at p. 32).  The petitioner, the court concluded, had not made this showing.  Nor had it explained how any other alternative would avoid or lessen one or more of the significant effects of the project.  (*Id*. at p. 33.)  In fact, the agency had found the project had no

significant impacts that could not be avoided or reduced to a less than significant level. (*Ibid*.) In the circumstances, the appellate court rejected the plaintiff's challenge to the adequacy of the range of alternatives analyzed in the EIR. (*Ibid*.)

The court in *Save Our Access* relied in part on an earlier case upholding an EIR that considered only a no-project alternative. (*Save Our Access*, *supra*, 68 Cal.App.5th at p. 31.) In that case, *Mount Shasta*, the EIR for a project to expand a manufacturing facility explained that it had considered but rejected from consideration several alternatives that either would not meet the project objectives or would result in increased environmental impacts. (*Mount Shasta*, *supra*, 210 Cal.App.4th at pp. 189, 197–198.) In the absence of a showing that the EIR failed to include a particular alternative that was potentially feasible or that the range of alternatives was not reasonable under the circumstances, the appellate court rejected the plaintiffs' challenge to the adequacy of the alternatives analysis. (*Id*. at p. 199; see also *San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 633 [rejecting contention that, as a matter of law, an EIR that considers only the proposed project and a no-project alternative is inadequate].)

Appellants argue that the draft EIR fell short of CEQA's requirements that it study a range of alternatives by eliminating from consideration a feasible alternative—the clay cover alternative, and that the added discussion in the final EIR did not remedy this omission.

We are unpersuaded. An EIR need discuss only alternatives that would avoid or substantially lessen any of the project's significant effects. (CEQA Guidelines, § 15126.6, subd. (a); *Save our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 703 (*Save our Capitol*).) The

draft EIR explained that each of the alternatives the City initially considered—including the clay cover alternative—would be infeasible, would have greater environmental effects (due in part to the steep slope of the landfill and the greater risk that a clay cover would fail), or would not reduce any significant effects. We have already rejected appellants' challenges to the EIR's analysis of the project's environmental effects, and we see no grounds to conclude that the project will have significant effects that an alternative would avoid or reduce.

We acknowledge that the range of alternatives analyzed in the draft EIR was provocatively narrow, especially because the no-project alternative was not viable from a regulatory standpoint. But even if this initial discussion was inadequate, the final EIR *did* examine a clay cover alternative in detail. Appellants argue that a defective draft EIR may not be remedied by addition of required material in a final EIR after public review and comment is complete. For this, they rely on *Joy Road Area Forest & Watershed Assn. v. California Dept. of Forestry & Fire Protection* (2006) 142 Cal.App.4th 656, 674–678, 683–684 (*Joy Road*), but that case does not assist them. In *Joy Road*, a state agency approved a planning document subject to CEQA (a timber harvest plan) that lacked an adequate analysis of one of the project's environmental effects and was thus insufficient as an informational document. (*Id*. at pp. 666, 676, 678.) Here, the EIR certified by the City *did* analyze a clay cover alternative in addition to the no-project alternative.[7]

---

[7] The timber harvest plan in *Joy Road* also added significant information about a different environmental effect after a draft had been made available for public review and comment, which triggered a need for recirculation. (*Joy Road*, *supra*, 142 Cal.App.4th at pp. 664, 683.) We will consider below whether the final EIR's expanded discussion of alternatives likewise mandated recirculation.

28

And the analysis added in the final EIR provided substantial evidence, consistent with the draft EIR, that a clay cover had no environmental advantages over the proposed project.

Appellants challenge the final EIR's analysis on the ground it "assumed," without supporting evidence, that clay would need to be imported to the project site; that the proposed artificial turf cover would be indistinguishable from natural grass; and that a clay cover would require more maintenance than the proposed cover. Not so. The final EIR did not make the assumption that clay would be imported; rather, it also contemplated that the necessary clay might come from on-site and thus increase the project's construction footprint. As we have explained, the final EIR includes a detailed discussion, supported by substantial evidence, of the aesthetic impacts of the artificial cover. And the final EIR explains that the landfill has "very steep, 2:1, slopes," and a clay cover would be more likely to fail and would require additional maintenance. It also explains that, although a natural or clay closure option was officially adopted in 1985 as part of Subchapter 15 of Title 27 of the California Code of Regulations, the ensuing 35 years of experience had shown "serious short-falls with compacted clay layers from both a performance and cost perspective—especially on sites with slope stability issues." And the responses to the Regional Board's comments, included in the final EIR, provide more supporting detail, explaining that vegetative soil covers require regular maintenance and that an economic analysis showed the 30-year post-closure maintenance costs for ClosureTurf would be approximately $277,000 less than for vegetative soil cover.

Appellants contend, however, that the economic analysis the City provided in response to the Regional Board's request is flawed and was thus

29

insufficient to allow not only the City but also the Regional Board and other agencies to determine whether to permit the project. Appellants point out that an estimate of closure and post-closure maintenance costs for a clay cover, prepared in 1999, showed lower costs than an estimate for the ClosureTurf prepared 17 years later, in 2016. As a result, they argue, the proposed project will not satisfy a regulation of the State Water Resources Control Board authorizing alternative covers only if a prescriptive cover would be "unreasonably and unnecessarily burdensome and will cost substantially more than alternatives" that meet the relevant criteria. (Cal. Code Regs., tit. 27, § 20080, subds. (b), (c).) Again, we are unpersuaded. It is not surprising that costs might have increased over the intervening period of almost two decades, and the differing estimates do not undermine the final EIR's economic analysis of alternatives.

In their reply brief, appellants rely upon different costs of two types of earthen covers, a compacted clay layer and a geosynthetic clay layer. In 2003, EBA Engineering prepared a report for the Regional Board that concluded final closure costs for geosynthetic clay liners were lower than for compacted clay liners covers. Based on this report, the final EIR compared the costs of the proposed product only to the geosynthetic clay liner. But appellants point out that in 2008, EBA Engineering revisited its analysis because of an increase in petroleum costs and concluded that at that time compacted clay liners were less costly then geosynthetic clay liners.

The parties point us to nothing in this record that explains why the final EIR relied on the 2003 comparison rather than the 2008 comparison. But we must resolve conflicts in the evidence in favor of the City's decision (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 984–985), and it does not appear the Regional Board expressed any

30

concerns about this aspect of the analysis. And this question about the costs of the project tells us nothing about whether either of the possible clay liner approaches would avoid or reduce any significant environmental effects. (See *Save our Capitol, supra*, 87 Cal.App.5th at p. 703.)[8]

We therefore conclude that appellants have not shown that the EIR's discussion of alternatives was inadequate.

## V.    RECIRCULATION

Appellants argue the final EIR includes significant new information that required it to be recirculated for comment from agencies and members of the public.[9]

If "significant new information" is added to an EIR after the draft EIR has been made available for public review but before certification, the lead agency must recirculate the EIR. (CEQA Guidelines, § 15088.5, subd. (a).) New information added to an EIR is significant only if "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon

---

[8] In responses to comments, the final EIR stated that a ClosureTurf cover "is conditionally approved by all of the necessary regulatory agencies, including Cal Recycle," and it drew attention to examples of other successful uses of artificial turf covers. Appellants argue this statement is inaccurate because no responsible agency had approved use of ClosureTurf for *this* project. The City in turn points to communications with agencies that it argues show they acknowledged the City's closure plans met their requirements. Regardless of whether the wording of this response to a comment was inartful, appellants do not show that it undermined the adequacy of the EIR.

[9] The City argues in a footnote that appellants forfeited this argument by failing to raise it properly below. (See *Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583.) But appellants argued both before the City and in the trial court that recirculation was required, and the trial court addressed the issue in its statement of decision. We will consider this argument on the merits.

31

a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative)." (*Ibid.*; *Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1183.) For example, the CEQA Guidelines explain, new information is significant when (1) "[a] new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented"; (2) there is a substantial increase to the severity of an environmental impact unless mitigated; (3) "[a] feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it"; and (4) the draft EIR was too "fundamentally and basically inadequate and conclusory" to allow meaningful public review and comment. (CEQA Guidelines, § 15088.5, subd. (a).) Where, however, the new information added to the EIR "merely clarifies or amplifies or makes insignificant modifications in an adequate EIR," recirculation is not necessary. (CEQA Guidelines, § 15088.5, subd. (b).) Recirculation is intended to be the exception, not the rule. (*Southwest Regional Council*, at p. 1184.) We review an agency's decision not to recirculate an EIR for substantial evidence, resolving doubts in favor of upholding the administrative decision. (*Ibid.*; CEQA Guidelines, § 15088.5, subd. (e).)

Appellants contend the final EIR meets the standard for recirculation in two respects: it added a discussion of a clay cover alternative; and it contained new information about ClosureTurf's susceptibility to wildfire damage. Both of these arguments fail.

Appellants argue that the draft EIR treated a clay cover alternative as not feasible but the final EIR "revers[ed]" that determination when it

analyzed such an alternative, which appellants treats as significant new information requiring recirculation.  But new information is not " 'significant' " unless it changes the EIR in a way that prevents meaningful comment on "a *substantial adverse environmental effect* of the project or *a feasible way to mitigate or avoid such an effect*."  (CEQA Guidelines, § 15088.5, subd. (a), italics added.)  The final EIR's analysis of a clay cover alternative found no respect in which it would avoid or lessen a significant environmental effect.  This conclusion was consistent with the draft EIR's discussion of the reasons the clay cover alternative was initially eliminated from consideration, including that it would *increase* the project's adverse effects.  Appellants have not shown these findings to be unsupported by substantial evidence.  The final EIR's discussion of the clay cover alternative thus did not trigger a need for recirculation.

The same is true of the final EIR's discussion of wildfire risk. Appellants rely on the final EIR's statement, made in response to the Regional Board's comment letter, that the City "shares concerns about catastrophic wildfires and [their] potential to adversely impact the landfill cover," as a result of which it would take out insurance to cover replacement costs in the event of a catastrophic wildfire.  This response does not show a "new significant environmental impact" triggering a need for recirculation. (CEQA Guidelines, § 15088.5, subd. (a)(1).)  Rather, the City found the project would *not* cause a significant environmental effect relating to wildfires, a finding we have upheld.  We thus conclude the City was not required to recirculate the EIR.[10]

_____

[10] As it did in the trial court, the City has requested judicial notice of three documents:  a June 2021 waste discharge order of the Regional Board for a closure of a different solid waste disposal site in Mendocino County; a resolution of the State Water Resources Control Board dated June 16, 2020,

## VI. AWARD OF COSTS

### A. Additional Procedural Background

After filing their petition for writ of mandate, appellants elected to prepare the record, and on September 18, 2020, they requested documents from the City under the California Public Records Act. (Former Gov. Code, § 6250 et seq.; see Gov. Code, § 7920.000 et seq.) City staff gathered documents and produced them on December 2, 2020.

Over the next 14 months, appellants sent seven meet and confer letters to the City requesting additional documents. In the first, they pointed out that the documents the City had produced did not include the initial studies or other documents associated with mitigated negative declarations prepared for the 1999 and 2016 versions of the Final Closure and Post-Closure Maintenance Plan (FCPMP); that the City had not produced any emails; and that the production lacked internal agency communications or documents from the City's consultants. The letter included a long list of allegedly omitted documents, beginning with a complaint about CEQA violations in 1989 and ending with documents created in 2020. Attorneys at the law firm representing the City identified individuals at the City and at its engineering consultants who might have responsive documents, gathered 750 additional documents, some dating back to the 1980's and 1990's and many of which had to be manually scanned into electronic format, and produced them on

---

adopting a definition of microplastics in drinking water; and the State Water Resources Control Board's notice of a November 2021 public workshop and invitation to comment on proposed standardized methods for testing microplastics in drinking water. None of these materials was before the City when it made its decision so, like the trial court, we deny the request for judicial notice. (See *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 890.)

34

January 29, 2021. In its memorandum of costs, the City did not seek the costs it incurred through January 2021.

Unsatisfied, appellants wrote again on February 19, 2021, asking that some of the documents be produced again in a different electronic format and asserting that the production of correspondence and internal communications was incomplete. They provided a list of more than 200 omitted documents, comprised of a letter from 1992, a few letters from 2000, and email correspondence from 2009 to 2020 (some of which were equally available to appellants, for instance because their counsel was the recipient of a requested email). Appellants also included a list of further categories of documents to be produced, including comments on environmental documents from 2000 and 2016, and correspondence related to a 2013 grand jury report on the delay in closing the landfill.

Attorney Kathryn Patterson, an associate with the law firm retained by the City, worked with City employees and EBA engineering to gather as many of the requested documents as possible, including attachments to emails, then requested further documents from the Regional Board, CalRecycle, and the County of Mendocino Local Enforcement Agency. Where these agencies had large volumes of paper records, Patterson or a city attorney travelled to the agency to review files in person. Some of these agencies indicated that appellants had already requested and obtained from them records related to the landfill, including more than 100 attachments to emails included in appellants' document request to the City.

The City produced additional documents on June 2, 2021, explaining as it did so that its initial production had been guided by two general principles: first, that the "[r]elevant [t]imeframe" for the project was the time falling between the issuance of the notice of preparation of the EIR in February 2017

and the date it filed its notice of determination in August 2020; and second, that documents outside that timeframe should be related to the subject matter of the complaint. It took the position that many of the documents appellants sought were irrelevant to the action, and it reminded appellants of their statutory duty to prepare the record at a reasonable cost. (§ 21167.6, subd. (f).) Nevertheless, the City explained, it was complying with the requests in appellants' meet and confer letter.

This process was repeated several more times before the administrative record was finally complete, as Patterson explained in declarations filed in support of the memorandum of costs. Patterson and City staff expended considerable time trying to locate the documents appellants requested in their successive meet and confer letters, sometimes finding that the documents had already been produced. Appellants had requested that the City produce attachments to emails already produced, apparently because they had not acquired software that would allow them to open the attachments as originally produced. To facilitate the search for these attachments within its system, the City asked appellants to provide the underlying emails, but appellants long failed to do so.

In March 2022, counsel for appellants provided a draft administrative record, but only some of the documents had hyperlinks and none of the hyperlinks worked, so the City engaged a vendor to hyperlink the documents itself. The administrative record was certified on May 4, 2022.

After the trial court denied the petition for writ of mandate, the City filed a memorandum of costs seeking to recover $76,056.31. The bulk of that amount—more than $73,000—represented legal fees for the time Patterson spent responding to appellants' requests, coordinating with other agencies, seeking documents, and compiling them for the administrative record.

36

Appellants moved to tax costs, contending the City was not entitled to recover for the time its attorneys spent on record preparation activities, and arguing the reason for the prolonged meet and confer process was that the City had not kept organized and comprehensive records about the landfill closure and its document productions were incomplete and unorganized. In response, the City provided a supplemental declaration by Patterson, accompanied by a thumb drive showing the format in which the documents had been provided to appellants throughout the process.

The trial court denied the motion to tax costs. In doing so, it expressly accepted Patterson's summary of events. The court found that appellants "essentially shifted to the City the responsibility to assemble the record and violated their duty to keep record preparation to a reasonable cost," for instance by asking the City to produce documents in the possession of third parties, although appellants had already requested the documents from the same third parties; by refusing to acquire and use software that would give them electronic access to records provided; by demanding documents that had already been produced; and by making requests that were overbroad, vague, and non-specific. After reviewing the billing records and meet and confer letters, the trial court concluded that the amount the City sought was reasonable and that the work required the involvement of someone with Patterson's background and experience.

Ruling on appellants' motion for a new trial on costs, the trial court expanded on this reasoning. The court clarified that its decision was not based on a finding that certain documents should not have been included in the record, but on its finding that the City was entitled to recover reasonable and necessary costs for record preparation, since appellants had "substantially failed in their duty to control the costs of record preparation"

37

by insisting that the City locate and retrieve documents that "were decades old," "of attenuated relevance," and/or previously produced to appellants. The court also found that Patterson's costs declaration (and the court's order) had "separated record preparation tasks and associated costs from other aspects of representing the City" and did not include reimbursement for "time related to 'research and analysis of legal issues' and other entries."

## B.    General Legal Standards

CEQA normally requires a plaintiff to ask the respondent public agency to prepare the administrative record (§ 21167.6, subd. (a)), and provides that "[t]he parties shall pay any reasonable costs or fees" connected to record preparation "in conformance with any law or rule of court" (§ 21167.6, subd. (b)(1)(A)). However, the plaintiff has the option to prepare the administrative record itself. (§ 21167.6, subd. (b)(2).) The party preparing the record "shall strive to do so at reasonable cost in light of the scope of the record of proceedings." (§ 21167.6, subd. (f).)

Under CEQA, the administrative record must include certain items. (§ 21167.6, subd. (e).) Among them are project application materials; staff reports prepared by the agency with respect to its compliance with CEQA and "the action on the project"; written comments received in connection with environmental documents prepared for the project; written evidence or correspondence to and from the agency with respect to the project and CEQA compliance; documentation of the agency's final decision (such as the final EIR) and all documents cited or relied on in the findings; and any other written materials relevant to the agency's compliance with CEQA or to its decision on the merits of the project, including copies of studies or other documents relied upon in any environmental document prepared for the project that was either available to the public or included in the agency's files

38

on the project, and "all internal agency communications, including staff notes and memoranda related to the project or to compliance with [CEQA]," with certain exceptions. (§ 21167.6, subd. (e).) However, the parties may agree to use "a partial record of proceedings that does not contain all the documents listed in subdivision (e) if approved by the court." (§ 21167.6, subd. (b)(1)(B).)

As a general rule in civil litigation, the prevailing party may recover reasonable costs. (*St. Vincent's School for Boys, Catholic Charities CYO v. City of San Rafael* (2008) 161 Cal.App.4th 989, 1013–1014 (*St. Vincent's School*), citing Code Civ. Proc., § 1032, subd. (b).)[11] In a CEQA action, those costs may include reasonable labor costs to compile the record. (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 293–295 (*California Oak*) [paralegal time]; *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 180–182 [paralegal and engineer with specialized knowledge].) An agency may be entitled to recover its costs even when the petitioner elected to prepare the administrative record, if its costs were incurred due to the petitioner's failure to comply with the statutory obligation to prepare the record at a reasonable cost. (*St. Vincent's School*, at pp. 1017, 1019.) However, it may not recover for such routine items as the time to review for completeness an administrative record prepared by a petitioner. (*Coalition*

---

[11] The petition for writ of mandate refers to both section 1085 (traditional mandate) and 1094.5 (administrative mandamus) of the Code of Civil Procedure. In a traditional mandate action, the prevailing party is entitled to its costs. (*Wagner Farms, Inc. v. Modesto Irrigation Dist.* (2006) 145 Cal.App.4th 765, 773 (*Wagner Farms*), citing Code Civ. Proc., § 1032, subd. (b).) In an administrative mandamus action, "[e]xcept when otherwise prescribed by statute, the cost of preparing the record shall be borne by the petitioner." (See Code of Civil Proc. §§ 1094.5, subd. (a); 1094.6, subd. (c).) Regardless of the appropriate form of this action, there is no dispute that the City is entitled to its reasonable costs.

39

*for Adequate Review v. City and County of San Francisco* (2014) 229
Cal.App.4th 1043, 1059 (*Coalition for Adequate Review*).)

When we review a cost order, our standard of review varies according
to the issue. If the question is whether a claimed cost falls within the general
cost statutes and is recoverable at all, our review is de novo. (*Coalition for
Adequate Review*, *supra*, 229 Cal.App.4th at pp. 1050–1051.) Likewise, we
review de novo the interpretation of CEQA's record preparation provisions.
(*Ibid.*; *Yolo Land & Water Defense v. County of Yolo* (2024) 105 Cal.App.5th
710, 715 (*Yolo Land & Water Defense*).) However, we review for abuse of
discretion whether a claimed cost to prepare the administrative was
necessary and reasonable. (*Coalition for Adequate Review*, at pp. 1050–
1051.) We find an abuse of discretion only if the court " ' "exceeds the bounds
of reason, all of the circumstances being considered." ' " (*California Oak*,
*supra*, 188 Cal.App.4th at p. 294.)

**C.  Analysis**

Appellants contend the trial court erred in awarding fees for
Patterson's time as an item of costs.

In certain circumstances, an agency may recover the costs of time spent
responding to the demands of a petitioner that elected to prepare the record.
This principle was explained in *St. Vincent's School*. There, the petitioner
elected to prepare the administrative record, and in the course of doing so
imposed "extraordinary costs" on the respondent city. (*St. Vincent's School*,
*supra*, 161 Cal.App.4th at p. 1014.) The city initially turned over 20 boxes of
documents to the petitioner. Noting that the production included only a few
emails, the petitioner submitted a Public Records Act request for all writings
stored electronically that reflected communications regarding the two
properties at issue in the CEQA action. (*Id.* at p. 1017.) The city was forced

to review nine boxes' worth of emails for responsiveness. (*Ibid.*) Dissatisfied with the small size of the resulting production of responsive, nonprivileged emails, the petitioner served a demand for inspection listing 15 further demands for documents. (*Id.* at p. 1018.)

This record, the appellate court concluded, "reflect[ed] a total disregard for cost containment on [the petitioner's] part, and a complete abandonment of its statutory duty to 'strive to [prepare the record] at reasonable cost.'" (*St. Vincent's School, supra,* 161 Cal.App.4th at p. 1018.) That is, after the city produced 20 boxes of documents, the plaintiff "subjected [it] to a costly and lengthy process of trawling through its entire computer system in response to an extremely broad and unbounded search," not because it had identified any gaps in the initial production but because it was not satisfied with the number of emails therein. (*Ibid.*) And the petitioner did not mention even a single later-provided email that bolstered any of its claims; indeed, it filed its brief before the issue of the emails was resolved. (*Id.* at p. 1019.) The trial court thus did not abuse its discretion in awarding information technology fees of more than $26,000. (*Ibid.*)[12]

_____

[12] Recently, the court in *Yolo Land & Water Defense* applied the same rule to affirm an order awarding costs that included staff and consultant time. The petitioner there elected to prepare the administrative record and asked respondent county to produce the necessary documents. (*Yolo Land & Water Defense, supra,* 105 Cal.App.5th at p. 715.) After the county prevailed in the writ proceeding, it sought and was awarded its costs associated with preparing the voluminous record. (*Id.* at pp. 714, 716.) The appellate court explained, in upholding the order awarding costs, "That appellants elected to prepare the record under section 21167.6, subdivision (b)(2) did not mean the County had no costs associated with preparation of the administrative record, and it did not preclude an award of record preparation costs to the County." (*Id.* at p. 715.)

Allowable "costs or fees" in a CEQA case (§ 21167.6, subd. (b)(1)) may also include reasonable attorney time spent on record preparation. For example, in *The Otay Ranch, L.P. v. County of San Diego* (2014) 230 Cal.App.4th 60 (*Otay Ranch*), the court upheld an award that included compensation for the time a county's retained counsel and paralegals spent to prepare the administrative record. (*Id.* at p. 67.) The petitioner there elected to prepare the record, but after months of inaction the county undertook to do so itself. (*Id.* at p. 70.) The appellate court explained that, "[g]iven the history and complexity of the project and how the documents were maintained, we cannot conclude the trial court exceeded the bounds of reason in determining it was 'reasonably necessary' for the County's retained counsel and paralegals to prepare the administrative record since the County 'did not have the resources or experienced personnel to prepare the [r]ecord.'" (*Ibid.*)

The court rejected a contention that this was an improper award of attorney fees, concluding, "Under the particular circumstances of this case where the trial court found it was reasonably necessary for the County to incur attorney and paralegal labor costs to prepare the administrative record within a short window of time, we see no reason to differentiate between those actual labor costs and actual labor costs for agency staff and document clerks to prepare an administrative record. Nor do we see a reason to differentiate between labor costs incurred by individuals directly employed by a public agency and those incurred by individuals employed by a private law firm retained by the agency, so long as the trial court determines, as it did here, the labor costs were reasonably and necessarily incurred for preparation of the administrative record." (*Otay Ranch, supra*, 230 Cal.App.4th at p. 70.) The county in that case was not seeking its attorney

42

fees for defending the action, but merely to recover the costs it actually incurred in preparing the record, which were properly recoverable. (*Id.* at p. 71.)

Two years later, the court in *No Toxic Air*, *Inc. v. Lehigh Southwest Cement Co.* (2016) 1 Cal.App.5th 1136, followed *Otay Ranch* to uphold an award of costs that included fees for paralegal and attorney time. The plaintiff there brought a petition for writ of mandate challenging a county's resolution finding that a surface mining operation owned by Lehigh Southwest Cement Co. (Lehigh) was a legal nonconforming use. (*Id.* at pp. 1137–1138.) After the trial court denied the writ petition and entered judgment in favor of the county and Lehigh, Lehigh sought the costs it incurred in preparing the administrative record, including labor costs of attorneys and paralegals. (*Id.* at pp. 1139–1140.) The trial court granted the plaintiff's motion to tax those costs (*id.* at p. 1140), and the appellate court reversed (*id.* at p. 1143). Looking to what it described as "parallel [CEQA] case law," the court explained that the rationale of *Otay Ranch* was equally applicable to the case before it. (*Id.* at pp. 1141–1142.) It concluded the labor costs for attorneys and paralegals should be treated no differently from other labor costs to create an administrative record, and it also noted that the trial court had found those costs reasonable and appropriate to the size and complexity of the record. (*Id.* at p. 1142.)

Faced with this authority, appellants make two primary contentions: that the time Patterson spent on unearthing documents and other tasks related to the administrative record does not fall within the scope of allowable costs as a matter of law; and that the costs awarded were not reasonably necessary to the litigation.

43

For their first argument, appellants rely in part on two unexceptionable principles: that a public agency may not seek costs for reviewing an administrative record prepared by a petitioner " 'for completeness' " in connection with certification (see *Coalition for Adequate Review, supra*, 229 Cal.App.4th at p. 1059), and that there is no basis in this case for an award of attorney fees incurred in defending an action (see Code Civ. Proc., §§ 1021, 1033.5, subd. (a)(10); see also *Wagner Farms, supra*, 145 Cal.App.4th at p. 779 [costs not recoverable for time that went beyond scope of record preparation]). But Patterson's declaration states that the only fees the City sought to recover for her time were based on her record preparation efforts, and the costs the City sought excluded the time she spent in her review of the draft administrative record for completeness.

Appellants argue that certain specific items on Patterson's invoices, such as drafting meet and confer letters, researching legal requirements for document production, and reviewing documents, constituted normal attorney activities to defend the case and were not recoverable. These specific challenges, which appellants make for the first time on appeal and to which the City had no opportunity to respond in the trial court, are forfeited.[13] (See *Thompson v. County of Los Angeles* (2022) 85 Cal.App.5th 376, 379, 382 [party who moved to tax expert witness fees as cost could not raise on appeal new ground to challenge that cost]; *Staples v. Hoefke* (1987) 189 Cal.App.3d 1397, 1409 [grounds not stated in motion to tax costs are waived]; see also *Premier Medical Management Systems, Inc. v. California Ins. Guarantee*

---

[13] The trial court explained that appellants' moving papers included no specific challenges to cost items. In their reply brief below, they made references to a few of Patterson's billing entries to show the delay in certifying the record was not due to their " 'fishing expeditions,' " but they did not raise the challenges they now make on appeal.

*Assn.* (2008) 163 Cal.App.4th 550, 564 [forfeiture of specific challenges to attorney fee award where challenger did not make claims about specific charges].) For the same reason, we reject appellants' more general claim that the trial court erred in failing to comb the record to distinguish attorney time for record preparation and time spent on normal defense activities. In any event, appellants have not shown the claimed costs exceeded permissible boundaries.

Appellants also argue that the cost order violates the rule that an agency may generally not claim costs for the time spent reviewing and producing documents for an administrative record. (See *Coalition for Adequate Review*, *supra*, 229 Cal.App.4th at pp. 1060–1061 [upholding trial court's denial of recovery for staff time based on finding petitioners did not abandon duty to contain costs].) This argument might have more force if the City had sought its costs for Patterson's time preparing the first two document productions, but it did not. It claimed costs for her time only after the second meet and confer letter in February 2019, when appellants asked the City to procure documents previously made available to them, of attenuated relevance, or in the possession of other public agencies. Patterson detailed the extensive efforts she made to respond to appellants' requests, and the trial court expressly accepted her version of events. The trial court found that by these events, appellants "essentially shifted to the City the responsibility to assemble the record and violated their duty to keep record preparation to a reasonable cost." We understand that appellants disagree, but on the record before us we cannot say this finding was outside the court's discretion.

Appellants protest that the City's initial productions were incomplete, that some of the older documents they sought were relevant to the feasibility

of a clay cover alternative, and that the communications they sought between the City and other agencies were properly part of the record. They also argue that the City relied on (and the trial court accepted) an artificially constricted view of the scope of an administrative record as limited to materials postdating the February 2017 notice of preparation of the EIR. (See *County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 7–8 [administrative record includes "pretty much everything that ever came near a proposed development" or to CEQA compliance]; accord, *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 63–64, overruled on another ground in *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457; § 21167.6, subd. (e)(10).) We are not persuaded. Although the City took the position that the "[r]elevant [t]imeframe" for the production generally began with the notice of preparation, it *also* recognized that documents outside that period were properly part of the record if related to the subject matter of the complaint. And in spite of its expressed concern that appellants were not preparing the record at reasonable cost, the City complied with appellants' requests, and it in fact produced many documents predating the notice of preparation in response to appellants' original meet and confer letter. And none of this undermines the trial court's finding that appellants abrogated their duty to keep record preparation to a reasonable cost, demanded documents to which it already had access through other agencies, and made duplicative document requests.

## DISPOSITION

The judgment and the order denying appellants' motion to tax costs are affirmed.

46

TUCHER, P.J.

WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.

*Russian Riverkeeper et al. v. City of Ukiah et al.*  (A168090/A169390)